UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT PADUCAH
CIVIL ACTION NO. 5:18-CV-041-TBR

GALE CARTER, *et al*.                                                      PLAINTIFFS

v.

PASCHALL TRUCK LINES, INC., *et al.*                          DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant Element Transportation, LLC's ("Element Transportation") Motion to Dismiss, [R. 32], and Defendant Paschall Truck Lines, Inc.'s ("PTL") Motion to Dismiss, [R. 55]. Plaintiffs Gale Carter and Forbes Hayes (hereinafter "Plaintiffs") responded to both motions. [R. 59; R. 76.] Element Transportation and PTL both replied. [R. 70; R. 78.] Fully briefed, this matter is now ripe for adjudication. For the reasons stated herein, Element Transportation's Motion to Dismiss, [R. 32], is **DENIED** and PTL's Motion to Dismiss, [R. 55], is **DENIED**.

## BACKGROUND

The factual allegations as set out in the First Amended Complaint, [R. 19 (First Amended Complaint)], and taken as true are as follows. *See Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008) (citing *Great Lakes Steel v. Deggendorf*, 716 F.2d 1101, 1105 (6th Cir. 1983)). This case arises out of Gale Carter and Forbes Hayes's previous employment as truck drivers for PTL. [R. 19 at 12.] Plaintiffs allege that Carter worked for the defendants as a commercial truck driver from "in or around October of 2015 to in or around December of 2015," and Hayes worked for the defendants from "in or around March of 2016 to in or around June of 2016." [*Id.*] Upon PTL hiring Carter and Hayes,

1

they were required to attend an orientation, which lasted several days. [*Id*. at 14.] After completing orientation, Plaintiffs state that PTL required each of them to sign an Independent Contractor Service Agreement ("ICS Agreement") with PTL and an Individual Program Lease Agreement, ("Lease Agreement"), with ECN.[1] [*Id*.] In or around September of 2016, Element Transportation purchased "certain leasehold assets" from ECN, including the leases of the Plaintiffs. [*Id*. at 6.] Plaintiffs contend this makes Element Transportation a successor in interest to ECN. [*Id*.]

In short, ECN leased tractor trailers to Plaintiffs who then subleased the tractor trailers and their driving services to PTL. [*Id*. at 4.] Plaintiffs claim that this arrangement was represented to them as a "Lease-Purchase Program." [*Id*. at 13.] Plaintiffs allege that the "extensive restrictions" placed on them through both agreements allowed ECN and PTL such control over Plaintiffs that ECN and PTL functioned as Plaintiffs' joint employers. [*Id*. at 6.] Specifically, Plaintiffs claim that as a condition of their employment for PTL, PTL required Plaintiffs to lease tractors from ECN, and, under the lease agreement with ECN, Plaintiffs could only drive for PTL. [*Id*. at 5.] If they did not drive for PTL, the Plaintiffs claim that they would default on their Lease Agreements, "subjecting Plaintiffs to an acceleration clause whereby Plaintiffs would be required to pay the entire balance of the lease immediately." [*Id*.] The Lease Agreement states that "Lessee shall use the Vehicle(s) only for providing transportation services for the Carrier identified herein . . .." [R. 32-2 at 3 (Lease Agreement).] On the page labeled "Schedule AB," PTL is documented as being the "Carrier." [*Id*. at 13.] Furthermore, the Lease Agreement reads:

---

[1] Technically, the Lease Agreements were between Plaintiffs and Element Financial Corp. ("EFC"). However, Plaintiffs list ECN as the successor to EFC and describe ECN as the other party involved in the Lease Agreements with Plaintiffs.

EVENTS OF DEFAULT. The occurrence of one or more of the following shall constitute an Event of Default: (a) Lessee shall cease using the Vehicle(s) for providing transportations services for the Carrier identified herein; (b) Lessee fails to pay when due any lease payments or any other payment under this Agreement; (c) Lessee fails to perform any other term or condition of this Agreement and such failure remains unremedied for more than ten (10) days after Lessor has requested Lessee to perform . . ..

[R. 32-2 at 6 (Lease Agreement).] Upon the event of default, ECN could

at its option and without demand or notice to Lessee, do any one or more of following: (a) pay all amounts required to be paid or perform or cause to be performed all obligations required to be performed by Lessee hereunder and charge Lessee as additional rent the amount paid or the reasonable value of all services performed therefore; (b) take immediate possession of the Vehicles in accordance with the provisions of Section 14; (c) declare the entire balance of lease payments for the remainder of the Lease Term and the End of Term value as set forth in Schedule AB immediately due and payable by acceleration and recover such amount as liquidated damages, the reasonableness of such damages being acknowledged by Lessee; or (d) terminate the Agreement and Lessee's rights hereunder and require Lessee at its sole cost to promptly return the Vehicle(s) to Lessor at such locations as Lessor may designate.

[*Id*.] Plaintiffs allege that this clause in the Lease Agreement subjected them to "more than $100,000 in liability" if they defaulted on the Lease Agreement. [R. 19 at 13.]

Under the ICS Agreement with PTL, Plaintiffs concede that they were purported to be independent contractors, but they make allegations that suggest otherwise. [*Id*. at 19.] Plaintiffs allege that the reality of their relationship with ICS contradicted several of the provisions of the ICS Agreement. [*Id*.] For instance, § 2.13 of the ICS Agreement states that Plaintiffs could have used the leased equipment for other purposes when not in service to PTL if, within twenty-four hours of that use, Plaintiffs notified PTL, cover any PTL logos, and confirm appropriate insurance coverage was in place. [R. 59-2 at 4, ¶ 2.13 (ICS Agreement).]  However, Plaintiffs allege they were not permitted to "use the commercial vehicles leased to them for any carrier other than Defendant PTL" and "[d]uring orientation, Defendant PTL instructed Plaintiffs that their employment and lease agreements would be terminated if they accepted work from any

3

carrier other than Defendant PTL." [R. 19 at 14.] Furthermore, Plaintiffs allege that the defendants' "pay structure and wage deduction practices and policies regularly caused Named Plaintiffs' wages to drop below the federal minimum wage of $7.25 per hour for all hours worked during a workweek." [R. 19 at 16.][2] Plaintiffs provide an example in which Hayes performed significant work during the week but was issued a pay stub on May 18, 2016 that provided no wages and lowered him further into debt due to the defendants' deductions for business expenses. [*Id*. at 16-17.] Also, the ICS Agreement allowed PTL to deduct an "early termination" fee of $5000.00 in liquidated damages if Plaintiffs ceased "providing services when required by PTL on a continuing basis within nine (9) months after the Effective date . . .." [R. 59-2 at 8 (ICS Agreement).][3] Overall, Plaintiffs contend that the defendants designed a "scheme" involving both agreements in order to "force continued labor of Plaintiffs by using threats of serious financial harm through explicit threats to impose, enforce, and collect significant debts." [*Id*.]

On December 19, 2017, Gale Carter and Forbes Hayes, on behalf of themselves and those similarly situated, filed the First Amended Complaint against PTL, ECN (as successor to EFC), and Element Transportation, LLC (as successor to ECN). [R. 19.] On February 14, 2018,

---

[2] Under the Lease Agreement, Carter and Hayes agreed to allow EFC to deduct weekly lease payments from their pay from PTL, approximately $622.87 and $495.00, respectively. [R. 32-2 at 5, 8, 13, 25.]

[3] Beyond these examples, Plaintiffs further describe their professional relationship with the defendants through the additional following claims:

> 78. Plaintiffs had no meaningful opportunity to increase their revenue by recruiting new customers, as they are/were not permitted to recruit new customers as a consequence of being permitted to accept only loads assigned to them by Defendants. . . .
> 80. Named Plaintiffs were not able to negotiate the rates that were paid to them on loads that were assigned to them by Defendant PTL. . . .
> 82. Collective and Class Plaintiffs were not able to negotiate the rates that were paid to them on loads assigned to them by Defendant PTL.
> 83. Plaintiffs can/could do little to increase their profitability other than attempt to work more hours and increase fuel efficiency
> 84. Plaintiffs are/were economically dependent upon Defendants.
> 85. At all times, Defendants directed, provided, and supervised the work performed by Plaintiffs on Defendants' behalf.

[*Id*. at 14-15.]

4

Element filed a Motion to Dismiss, [R. 32], and on April 3, 2018, PTL filed a Motion to Dismiss, [R. 55]. Both motions to dismiss are currently before the Court.

## STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In order to survive a motion to dismiss under Rule 12(b)(6), a party must "plead enough 'factual matter' to raise a 'plausible' inference of wrongdoing." *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 504 (6th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A claim becomes plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). When considering a Rule 12(b)(6) motion to dismiss, the court must presume all of the factual allegations in the complaint are true and draw all reasonable inferences in favor of the non-moving party. *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008) (citing *Great Lakes Steel v. Deggendorf*, 716 F.2d 1101, 1105 (6th Cir. 1983)). "The court need not, however, accept unwarranted factual inferences." *Id.* (citing *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987)). Should the well-pleaded facts support no "more than the mere possibility of misconduct," then dismissal is warranted. *Iqbal*, 556 U.S at 679. The Court may grant a motion to dismiss "only if, after drawing all reasonable inferences from the allegations in the complaint in favor of the plaintiff, the complaint still fails to allege a plausible theory of relief." *Garceau v. City of Flint*, 572 F. App'x. 369, 371 (6th Cir. 2014) (citing *Iqbal*, 556 U.S. at 677–79).

## DISCUSSION

In the First Amended Complaint**,** Plaintiffs bring claims against the defendants on four different counts: violations of the Fair Labor Standards Act, ("FLSA"), 29 U.S.C. § 216b, [R. 19 at 24], the Truth in Leasing Act, ("TILA"), 49 U.S.C. § 14704, [*Id*. at 25], the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1589, [*Id*. at 25-26], and common law unjust enrichment, [*Id*. at 26]. Element Transportation moves to dismiss all counts of the First Amended Complaint, [R. 32-1 at 2 (Element Transportation Motion to Dismiss)], and PTL moves to dismiss counts II-IV, [R. 55-1 at 5 (PTL Motion to Dismiss)]. As Element Transportation's Motion to Dismiss and PTL's Motion to Dismiss involve the same subject matter, the Court will consider the two motions together.

## I.   Element Transportation Motion to Dismiss

Element Transportation moves the Court to dismiss all of the claims contained in Plaintiffs' First Amended Complaint on three grounds: First, it argues that the First Amended Complaint fails to "plausibly establish that Element Transportation is liable as a successor to ECN for any of Plaintiffs' claims." [R. 32-1 at 2.] Second, it asserts that Plaintiffs' allegations are "insufficient to plausibly establish that ECN is liable as a successor to EFC." [*Id*.] Last, it contends that any claim Plaintiffs may attempt to state against EFC would fail. [*Id*.] As the first two arguments operate as a threshold to the last argument, the Court will address each issue in turn.

### A.  Element Transportation as a Successor to ECN

Element Transportation argues that Plaintiffs' have not plausibly alleged that Element Transportation is liable as a successor to ECN. [*Id.* at 4.] Plaintiffs respond that a successorship liability analysis is inappropriate at this time, before the commencement of discovery. [R. 59 at

9-13.] Furthermore, Plaintiffs quote public filings in which Element Transportation and ECN referred to themselves as successors in interest to Element Financial Corp.. [*Id*. at 13-16.]

In regards to Plaintiffs' first argument, the Court does not agree that "discovery is *required*" in order to properly determine whether a party is a successor in interest. [*Id*. at 12 (emphasis added).] Although Plaintiffs cite to plentiful case law in which a successorship liability analysis was performed at the summary judgment stage of litigation, [*Id*. at 12], this does not confirm that the analysis cannot be performed at the motion to dismiss stage. In fact, as Element Transportation acknowledges in its Reply, [R. 70 at 2 (Element Transportation Reply)], several courts within the Sixth Circuit have done just that. *See, e.g., Comer v. Directv, LLC*, No. 2:14-CV-1986, 2016 WL 853027, at *3-6 (S.D. Ohio Mar. 4, 2016) (finding that the doctrine of successor liability applied and the plaintiff adequately pleaded a case of successor liability at the motion to dismiss stage); *Dowd v. Directv, LLC*, No. 14-CV-14018, 2016 WL 28866, at *9 (E.D. Mich. Jan. 4, 2016) (denying defendants' motion to dismiss after finding successor liability was appropriate); *Shaw v. Total Image Specialists, Inc.*, No. 2:07-CV-717, 2010 WL 1390470, at *4 (S.D. Ohio Apr. 1, 2010) (granting defendants' motion to dismiss on an FMLA claim after analyzing whether the defendant was a successor in interest). Granted, discovery proves to be rather helpful in performing this analysis. For instance, in *Clark v. Shop24Global, LLC*, 77 F. Supp. 3d 660, 693-94 (S.D. Ohio 2015), the Southern District of Ohio was able to refer to a deposition and the asset transfer agreement between the parties in making its decision. Still, the Court will perform the successorship liability analysis with the information before it.[4]

---

[4] Although district courts within the Sixth Circuit have previously applied successor liability under the FLSA, the Court finds no precedent, and the parties provide no case law, for the application of successor liability under the TILA regulations or the federal forced labor statute. However, as the parties do not dispute its application, the Court will engage in the successor liability analysis for the purposes of this motion.

"Successor liability is appropriate in the employment-law context if 'the imposition of such liability would be equitable.'" *Comer*, No. 2:14-CV-1986, 2016 WL 853027, at *5 (quoting *Cobb v. Contract Transp., Inc.*, 452 F.3d 543, 554 (6th Cir. 2006)). In order to determine whether successor liability is equitable in a particular case, the Court must balance "1) the interests of the defendant-employer, 2) the interests of the plaintiff-employee, and 3) the goals of federal policy, in light of the particular facts of a case and the particular legal obligation at issue." *Cobb*, 452 F.3d at 554 (citing *EEOC v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086, 1091 (6th Cir. 1974)). "There is, and can be, no single definition of 'successor' which is applicable in every legal context." *MacMillan*, 503 F.2d at 1091. Furthermore, "[s]uccessor liability questions must be answered on a case by case basis, and 'a new employer . . . may be a successor for some purposes and not for others.'" *Cobb*, 452 F.3d at 554 (quoting *MacMillan*, 503 F.2d at 1091). The Sixth Circuit also held that the following nine factors are relevant when considering successorship liability:

> (1) whether the successor company has notice of the charge; (2) the ability of the predecessor to provide relief; (3) whether the new employer uses the same plant; (4) whether there has been substantial continuity of business operations; (5) whether the new employer uses the same or substantially same workforce; (6) whether the new employer uses the same or substantially same supervisory personnel; (7) whether the same jobs exist under substantially the same working conditions; (8) whether [the defendant] uses the same machinery, equipment and methods of production; and (9) whether [the defendant] produces the same product.

*Cobb*, 452 F.3d at 554. The Sixth Circuit further explained that these factors are "not in themselves the test for successor liability" but "simply factors courts have considered when applying the three prong balancing approach, considering the defendant's interests, the plaintiff's interests, and federal policy." *Id*. "The ultimate inquiry always remains whether the imposition of the particular legal obligation at issue would be equitable and in keeping with federal policy." *Id*.

8

As an initial matter, the Court emphasizes that the nine *Macmillan* factors are simply factors for the Court to consider in determining whether successor liability is equitable in the case at hand. In contrast, Element Transportation argues under each of the nine *Macmillan* factors in a fashion that implies that they are the lone requirement for considering successor liability. [R. 32-1 at 5-8.] For instance, Element Transportation never mentions the fact that these factors are merely for the Court's consideration, "not in themselves the test for successor liability." *Cobb*, 452 F.3d at 554. Here, Plaintiffs allege that Element Transportation currently provides equipment financing to PTL, including vehicle fleet leasing, and that Element Transportation benefits from past illegal agreements between ECN and the Plaintiffs. [R. 19 at 4, ¶ 16; 13, ¶ 58.] Furthermore, Plaintiffs allege that Element Transportation purchased "certain leasehold assets," including the Plaintiffs' leases, from ECN in or around September of 2016. [*Id*. at 6, ¶ 25.] These factual allegations suggest that there has been a "substantial continuity of business operations" through Element Transportation's purchase of assets and continuation of equipment financing to PTL. *See Cobb*, 452 F.3d at 554. Moreover, these allegations also raise the plausible inference that Element Transportation could be receiving a continuing benefit from the unfair labor practices of its predecessors if Plaintiffs still owe a balance. *See id*. at 555 (citing *Golden State Bottling Company, Inc., v. NLRB*, 414 U.S. 168, 184-85) ("[W]hen imposing liability for a predecessor's illegal conduct, courts look to the transfer of assets and substantial continuity of the business enterprise. This is because the value of the assets, and of the business generally, is presumed to have increased from the illegal conduct, thus benefitting any successor."). Thus, it would be equitable to disgorge Element Transportation of any such allegedly illegal benefit. *Id*. at 553 ("The Court reasoned that the purchaser-company receives a

continuing benefit from its predecessor's illegal actions, and thus it is appropriate for the company to disgorge the illegal benefit.").

Element Transportation retorts that Element Transportation did not profit from the Plaintiffs' lease agreements because there were no liens, encumbrances, or other liabilities associated with the vehicles and the Plaintiffs ceased working for PTL prior to Element Transportation purchasing the leasehold assets.[5] At this stage in the proceedings, the Plaintiffs are not required to prove that Element Transportation profited from the Plaintiffs' leasehold assets. *See Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). The Plaintiffs' are only required to "plead enough 'factual matter' to raise a 'plausible' inference of wrongdoing." *16630 Southfield Ltd. P'ship*, 727 F.3d at 504 (quoting *Iqbal*, 556 U.S. at 678). Presuming all of the factual allegations in the complaint are true and drawing all reasonable inferences in favor of the non-moving party, the Court finds that the Plaintiffs sufficiently plead that Element Transportation is a successor to ECN.

### B.  ECN as a Successor to ECF

Element Transportation also argues that Plaintiffs have not plausibly alleged that ECN is liable as a successor to EFC. [32-1 at 4.] In other words: even if Element Transportation is a successor to ECN, if ECN is not a successor to EFC, Element Transportation should shoulder no successor liability. Overall, Element Transportation contends that Plaintiffs do not allege any facts concerning the relationship between ECN and EFC. However, logically, there is a plausible connection between the two companies as Element Transportation allegedly purchased leasehold assets owned by ECN, which included the lease agreements between the Plaintiffs and EFC. [R. 19 at 6, ¶ 25.] This implies that ECN possibly obtained the assets from EFC. Furthermore, the

---

[5] In effect, Element Transportation argues that the Plaintiffs' lease agreements were terminated when the Plaintiffs' stopped working for PTL and no further payments upon those lease agreements were received. [R. 70 at 3.]

Plaintiffs quote a statement of Element Transportation from a previous public filing that

contradicts Element Transportation's current stance:

> The Complaint clearly alleges that Plaintiff ECN Financial, LLC is the successor
> to Element Financial Corp. (see Exhibit A, paragraph 1), and the Court is bound
> to accept the truth of the allegation when considering the Defendant's 12(b)(6)
> motion. Moreover, the legal conversion of Element Financial Corp. to ECN
> Financial, LLC is a matter of public record which the Court is independently
> entitled to review.

[R. 59 at 15.] At this point in litigation, prior to discovery, the Court finds Plaintiffs pleaded

enough factual matter to raise a plausible inference that ECN is a successor to ECF. However,

the Court recognizes the importance of the threshold issue of whether Element Transportation,

by way of ECN, is a successor to EFC. Thus, in an effort to preserve judicial economy, the Court

will order a period of discovery specifically on the issue of whether Element Transportation is a

successor to ECN and whether ECN is a successor to EFC before the Court analyzes the

substance of the claims against EFC.

### C.  Element Transportation as a Successor Under Pennsylvania Law

After arguing the issue of successor liability under federal common law, Element

Transportation contends that Element Transportation is not liable as a successor to ECN, or ECN

to EFC, under Pennsylvania law, and, therefore, Plaintiffs' claim of unjust enrichment should be

dismissed. [R. 32-1 at 8.] Element Transportation makes this argument without any explanation

or case law to support the notion that the issue of successor liability, in regards to the claim of

unjust enrichment, must be decided under Pennsylvania law due to the fact that unjust

enrichment is a state law claim and the Lease Agreement contained a Pennsylvania choice of law

provision.

Under Pennsylvania law, "it is well-established that 'when one company sells or transfers

all of its assets to another company, the purchasing or receiving company is not responsible for

the debts and liabilities of the selling company simply because it acquired the seller's property.'"
*Cont'l Ins. Co. v. Schneider, Inc.*, 582 Pa. 591, 599 (2005) (quoting *Hill v. Trailmobile*, 603 A.2d
602, 605 (1992)). However, this rule is overcome if it is established that "(1) the purchaser
expressly or implicitly agreed to assume liability, (2) the transaction amounted to a consolidation
or merger, (3) the purchasing corporation was merely a continuation of the selling corporation,
(4) the transaction was fraudulently entered into to escape liability, or (5) the transfer was
without adequate consideration and no provisions were made for creditors of the selling
corporation." *Hill,* 603 A.2d at 605.[6]

Unlike in the federal common law context, the Court found little case law involving
successor liability upon a 12(b)(6) motion to dismiss, in Pennsylvania law or Kentucky law. In
fact, the Court discovered that courts commonly defer deciding the issue of successor liability
under Pennsylvania law, in the context of a 12(b)(6) motion, until discovery may be gathered.
*See  Vital Pharm., Inc. v. USA Sports, LLC*, No. 3:11-CV-975, 2012 WL 760561, at *5 (M.D. Pa.
Mar. 8, 2012) ("Because the issue on a motion to dismiss 'is not whether a plaintiff will
ultimately prevail but whether he or she is entitled to offer evidence to support the claims,'
*Oatway v. Am. Int'l Grp., Inc.,* 325 F.3d 184, 187 (3d Cir.2003), the Court will not resolve the
predecessor entity issue on a motion to dismiss."); *Brennan v. Nat'l Tel. Directory Corp.*, 850 F.
Supp. 331, 339 (E.D. Pa. 1994) (finding that any determination of successor liability at the
motion to dismiss stage "will be factual, and therefore we cannot properly consider the issue at

---

[6] Similarly, under Kentucky law: "The only exceptions to the general rule that a purchaser, in the absence of a
contract obligation, cannot be held responsible for the debts and liabilities of the selling corporation, are:
(1) where the purchaser expressly or impliedly agrees to assume such debts or other liabilities; (2) where the
transaction amounts to a consolidation or merger of the seller and purchaser; (3) where the purchasing corporation is
merely a continuation of the selling corporation; or (4) where the transaction is entered into fraudulently in order to
escape liability for such debts." *Pearson ex rel. Trent v. Nat'l Feeding Sys., Inc.*, 90 S.W.3d 46, 49 (Ky. 2002)

this point in time"). Therefore, the Court will wait to decide this issue until after discovery, at which point Element Transportation may file a motion for summary judgment on the matter.

In summary, the Court finds Plaintiffs pleaded enough factual matter to raise a plausible inference that Element Transportation is a successor to ECN and ECN is a successor to EFC. Thus, Element Transportation's Motion to Dismiss, [R.32], is DENIED. However, as it is a threshold issue, the Court will order a period of discovery specifically on the issue of whether Element Transportation is a successor to ECN and whether ECN is a successor to EFC before analyzing the substantive claims against EFC.

## II.     Paschall Truck Lines, Inc.'s Motion to Dismiss

PTL moves the Court to dismiss Counts II-IV of the First Amended Complaint. [R. 55-1 at 5.] First, it argues that Plaintiffs' claims under the TILA regulations, i.e., Count II of the First Amended Complaint, should be dismissed because (1) the ICS Agreement did not violate federal leasing regulations by seeking indemnification from contractors and (2) Plaintiffs have not alleged actual damages from any alleged TILA regulation violations. [*Id*. at 8-12.] Second, PTL contends that Plaintiffs have failed to allege that PTL violated the Forced Labor Statute, i.e., Count III of the First Amended Complaint, because (1) Plaintiffs did not plead facts demonstrating that "PTL caused Plaintiffs to believe facts that, if true, would demonstrate PTL caused Plaintiffs to believe they would suffer 'serious harm' if they did not continue to work for PTL" and (2) Plaintiffs failed to allege that PTL had the required intent. [*Id*. at 12-17.] Finally, PTL argues the Plaintiffs' claim for unjust enrichment should be dismissed because, under Kentucky law, unjust enrichment is "unavailable when the terms of an express contract control." [*Id*. at 17-18.] The Court will address each argument in turn.

### A.  Violations of the Truth in Leasing Act

1. **Indemnification**

In the First Amended Complaint, Plaintiffs list the indemnification clause of the ICS

Agreement as an example of allegedly one of many violations of the TILA regulations, which

govern the motor-carrier industry and leasing agreements like the one at issue. [R. 19 at 18-19.]

PTL interprets this portion of the First Amended Complaint to be an "allegation that the

existence of the clause amounts to a per se violation of the Leasing Regulations" and argues for

its dismissal. [R. 78 at 6 (PTL Reply).] The Court finds this to be a mischaracterization of the

First Amended Complaint. The specific portions PTL speaks of fall within a list of eight different

examples to support Plaintiffs' allegation that "the ICS Agreements contain several provisions

that violate the Truth-in-Leasing Regulations." [R. 19 at 18-19.] Specifically, this excerpt of the

First Amended Complaint reads as follows:

> 105. Additionally, the ICS Agreements contain several provisions that violate the
> Truth-in-Leasing Regulations, as, by way of example only:
>
> a. Paragraph 4.04 of the Agreements requires Named Plaintiffs and Class
> Plaintiffs to indemnify Defendant PTL and hold Named Plaintiffs and
> Class Plaintiffs responsible for various claims, fees, costs and penalties.
> These provisions impermissibly seek to limit Defendant PTL's exclusive
> possession, control and responsibility concerning the operation of the
> vehicles, in violation of 49 C.F.R. § 376.12(c)(1).
>
> b. Paragraph 4.04(a) states that Named Plaintiffs and Class Plaintiffs are
> responsible for the first $2,500 of any loss relating to any personal injury
> to a third party or a damage to property resulting from any act or omission
> of Named Plaintiffs and Class Plaintiffs while under Defendant PTL's
> dispatch. Said provision further states that Named Plaintiffs and Class
> Plaintiffs would be responsible for the entirety of the loss in the event that
> Named Plaintiffs and Class Plaintiffs failed to immediately report the
> occurrence or the equipment was operated with an unauthorized person
> present. This limitation of Defendant PTL's liability further limits its
> exclusive possession, control and responsibility concerning the operation
> of the vehicles, in violation of 49 C.F.R. § 376.12(c)(1).

14

[*Id.*] Nowhere in the First Amended Complaint do the Plaintiffs assert that the existence of an indemnity clause amounted to a "per se violation" of the leasing regulations. Moreover, Plaintiffs specifically preface the list of alleged violations with the statement: "by way of example only." [*Id*. at 18.] This implies that these factual allegations are but a sample of information that is available or is to come after discovery.

In further support of its argument, PTL cites to *Transamerican Freight Lines, Inc. v. Brada Miller Freight Systems*, 423 U.S. 28 (1975), in which the Supreme Court stated:

> [T]he mere presence of a [indemnification] clause such as the one here that the lessor is to bear the burden of its own negligence does not, in and of itself, offend the regulations so long as the lessee does not absolve itself from the duties to the public and to shippers imposed upon it by the Commission's regulations.

423 U.S. at 235. In other words, an indemnification clause does not necessarily violate the requirement of 49 C.F.R. § 376.12(c)(1) that "the authorized carrier lessee shall have exclusive possession, control, and use of the equipment for the duration of the lease."[7] However, the Supreme Court also stated in *Transamerican Freight Lines, Inc.*:  "This is not to say, of course, that the presence of an indemnification clause, or its character, may not be a factor to be considered in determining whether a particular arrangement between carriers is an illegal sharing of operating authority or is a legal lease of equipment." 423 U.S. at 235. This is precisely what Plaintiffs allege in their First Amended Complaint. "[A]s, by way of example only," Plaintiffs cited two portions of the indemnification clause of the ICS agreement in the First Amended Complaint in order to illustrate an alleged violation of the TILA regulations, specifically 49 C.F.R. § 376.12(c)(1). [R. 19 at 18-19.] At this early stage in litigation, the Court finds this to be

---

[7] In full, the regulation states: "The lease shall provide that the authorized carrier lessee shall have exclusive possession, control, and use of the equipment for the duration of the lease. The lease shall further provide that the authorized carrier lessee shall assume complete responsibility for the operation of the equipment for the duration of the lease." 49 C.F.R. § 376.12(c)(1).

more akin to "a factor to be considered" in determining whether PTL violated the TILA regulations rather than an allegation of a "per se" violation. Thus, the Court denies PTL's request to "dismiss paragraphs 105(a) and (b) of Plaintiffs' Leasing Regulations claim." [R. 78 at 6.]

### 2. Actual Damages

Under 49 U.S.C. § 14704(a)(2), "Damages for violations: A carrier or broker providing transportation or service subject to jurisdiction under chapter 135 is liable for damages sustained by a person as a result of an act or omission of that carrier or broker in violation of this part." 49 U.S.C. § 14704(a)(2). PTL argues that "Plaintiffs only have a claim under the Leasing Regulations if they can demonstrate they 'suffered a loss' because of a Leasing Regulation violation," yet Plaintiffs failed to do so. [R. 55-1 at 10.] PTL contends that "[t]he only attempt Plaintiffs' make at pleading facts to support their claim for damages is their claim that they 'were disadvantaged by a lack of transparency in their contractual relationship with [PTL].'" [*Id*. at 10-11.] Plaintiffs respond that they pleaded actual damages by describing the "mounting debts and lost revenues incurred" from the ICS and Lease Agreements. [R. 76 at 9-10.] The Court agrees with the Plaintiffs.

Beyond the fact that most of the case law cited by PTL occurred, procedurally speaking, after discovery[8]—a drastically different stage in litigation than the one at hand, i.e., Rule 12(b)(6) Motion to Dismiss—the Court finds PTL's assertion that "[t]he only attempt Plaintiffs' make at pleading facts to support their claim for damages is their claim that they 'were disadvantaged by a lack of transparency in their contractual relationship'" to be disingenuous. [R. 55-1 at 10-11.] As Plaintiffs mention in their Response, the First Amended Complaint states that this "lack of transparency in their contractual relationship" caused Plaintiffs' wages to drop below minimum wage and eventually

---

[8] *See Fox v. Transam Leasing, Inc.*, 839 F.3d 1209, 1218-19 (10th Cir. 2016) (holding that the defendant met its burden "by arguing in its summary judgment motion that the truckers put forth no evidence that they suffered actual damages"); *Owner Operator Independent Drivers Ass', Inc.("OOIDA") v. Swift Transportation Co., Inc. (AZ)*, 632 F.3d 1111, 1122 (9th Cir. 2011) (upholding summary judgment on the district court's finding that plaintiffs failed to demonstrate actual damages); *OOIDA v. Landstar System, Inc.*, 622 F.3d 1307, 1325 (11th Cir. 2010) (finding the district court's ruling at a bench trial to be correct that "the Owner–Operators must prove actual damages").

induced the Plaintiffs to fall into debt to PTL. [R. 19 at 16-17, ¶¶ 93-95.] In support of its argument, PTL cites to *Derolf v. Risinger Bros. Transfer*, 259 F. Supp. 3d 876 (C.D. Ill. 2017), in which the Central District of Illinois dismissed the plaintiffs' claims under the TILA because the plaintiffs' allegations of real damages through financial harm were "not attributable to any alleged *deficiency in the transparency of the lease terms*, but rather to the alleged inputting of incorrect distance amounts into the compensation calculation." 259 F. Supp. 3d at 886 (emphasis added).[9] Unlike the plaintiffs in *Derolf*, the Plaintiffs before the Court alleged in the First Amended Complaint that they were "disadvantaged by a lack of transparency in their contractual relationship with Defendant PTL, resulting in damages," specifically under-compensation. [R. 19 at 22, ¶ 109; 16, ¶ 93.]

Furthermore, the Court finds Plaintiffs' citation of *Davis v. Colonial Freight Systems*, Civ. A. No. 3:16-cv-674 (E.D. Tenn. Nov. 22, 2017), quite persuasive. In *Davis*, the court held that the plaintiff truck driver's allegation that the defendants, a truckload carrier and a truck leasing company, "underpaid him and failed to provide him with documentation that would have confirmed the underpayments" was sufficient to plead TILA damages.[10] [R. 59-7 at 14 (citing *Mervyn v. Nelson Westerberg, Inc.*, No. 11 C 6594, 2012 WL 6568338, at *3 (N.D. Ill. Dec. 17, 2012) (holding that plaintiff's allegation that the defendants underpaid him and failed to provide him with documentation confirming that underpayment was sufficient to plead damages under § 14704(a)).) Similarly, in the matter at hand, Plaintiffs allege that they were underpaid due to the defendants' "pay structure and wage deduction practices and policies." [R. 19 at 16, ¶ 93.] Although PTL prefers to interpret the First Amended Complaint quite narrowly by urging that "Plaintiffs do not allege they were underpaid

---

[9] The Court notes that PTL also cites to this Court's holding in *Adams v. Fifth Third Bank*, in which the Court found that the plaintiffs' claim that "[e]ach impermissible hard inquiry for [Plaintiffs'] consumer credit report . . . lower[ed] their credit score by up to five points or more" was insufficient to constitute actual damages under § 1681o of the Fair Credit Reporting Act ("FCRA"). *Adams*, No. 3:16-CV-00218-TBR, 2017 WL 561336, at *7 (W.D. Ky. Feb. 10, 2017). The case at hand is clearly distinguishable from *Adams* in that it does not involve the FCRA nor are the Plaintiffs attempting to argue that a drop in their credit score should constitute "actual damages" under the FCRA. Rather, Plaintiffs allege financial loss as actual damages under the TILA regulations.
[10] The court in *Davis* also pointed out that there was no Sixth Circuit case law cited by either party standing for "the proposition that a plaintiff must allege damages to state a claim under 49 U.S.C. § 14704." [R. 59-7 at 14.]

in connection with their Leasing Regulations claim," [R. 78 at 5], the Court reads the Complaint as a whole, instead of separating each section from the next, and finds Plaintiffs' allegation sufficient. *See Stratton v. Portfolio Recovery Assocs., LLC*, 770 F.3d 443, 446 (6th Cir. 2014), *as amended* (Dec. 11, 2014) ("The plaintiff's allegations must be accepted as true, the complaint must be read 'as a whole,' and all reasonable inferences must be drawn in the plaintiff's favor.") (citing *Matrixx Initiatives, Inc., v. Siracusano*, ––– U.S. ––––, 131 S. Ct. 1309, 1323 (2011)). Therefore, the Court finds that Plaintiffs successfully pleaded damages for their claims involving TILA violations.

### 3.  Injunctive Relief

At the end of its discussion of damages in its Motion to Dismiss, PTL mentions what appears to be a "suggestion" in the First Amended Complaint that "a plaintiff suing under the Leasing Regulations may be entitled to injunctive relief." [R. 55-1 at 11.] PTL argues that Plaintiffs do not have standing to seek injunctive relief because "they are not suffering an ongoing harm based on the terms of those Agreements warranting injunctive relief." *Id*. at 12. However, at this early stage in the litigation, the Court finds that Plaintiffs' "general factual allegations of injury resulting from the defendant's conduct" suffice. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (finding that, in the context of establishing standing, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim'"); *accord McKay v. Federspiel,* 823 F.3d 862, 868 (6th Cir. 2016), *cert. denied*, 137 S. Ct. 1229, 197 L. Ed. 2d 464 (2017) (upon arguments regarding standing, finding that "[w]hile 'mere allegations' might have been enough to survive a standing challenge at the motion to dismiss stage, they are insufficient to carry [the plaintiff] past summary judgment").

In summary, PTL's Motion to Dismiss as it pertains to Count II of the First Amended Complaint is DENIED.

### B.  Violations of the TVPRA

Under Count IV of the First Amended Complaint, Plaintiffs allege that the defendants' conduct violated 18 U.S.C. §§ 1589 and 1595.[11] [R. 19 at 26.] "The federal forced labor statute, 18 U.S.C. § 1589, was enacted as part of the Victims of Trafficking and Violence Prevention Act of 2000 (also known as the Trafficking Victims Protection Act)." *United States v. Callahan*, 801 F.3d 606, 617 (6th Cir. 2015). Relevant to the arguments before the Court are sections 1589(a) and (b), which state:

> **(a)** Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means--
>> **(1)** by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
>> **(2)** by means of serious harm or threats of serious harm to that person or another person;
>> **(3)** by means of the abuse or threatened abuse of law or legal process; or
>> **(4)** by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint, shall be punished as provided under subsection (d).
>
> **(b)** Whoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means, shall be punished as provided in subsection (d).

18 U.S.C. § 1589(a-b). In its Motion to Dismiss, PTL argues that Plaintiffs (1) failed to sufficiently plead that  PTL caused Plaintiffs to believe they would suffer "serious harm" if they ceased working for PTL and (2) Plaintiffs did not plead sufficient facts to satisfy the intent requirement of the statute. [R. 55-1 at 12-17.] Plaintiffs disagree.

As an initial matter, the Court must address two arguments made by PTL that affect the Courts consideration of the aforementioned issues. First, PTL argues that any allegations that

---

[11] The Court notes that §1595 involves the civil remedy available for a violation of the chapter. 18 U.S.C. § 1595. It is not discussed or disputed in the parties' briefs.

that PTL violated the federal forced labor statute based on the terms of the lease agreement with

ECN must fail because "Plaintiffs have included no allegations that PTL is a third-party

beneficiary of the equipment lease or that PTL had any involvement in the drafting, performance,

or enforcement of the equipment lease." [R. 55-1 at 13 n.3.] However, the Court finds that

Plaintiffs alleged such a collaboration between the defendants when they stated that PTL

required Plaintiffs to sign both an ICS Agreement and a Lease Agreement with ECN at

orientation in order to participate in the "Lease-Purchase Program" and contended "[o]n

information and belief, Defendant PTL and Defendant ECN entered into joint agreements to

administer the Lease-Purchase Program that Plaintiffs participated in, including the deduction of

lease and maintenance payments from Plaintiffs' settlement sheets and the division of such

payments between Defendant PTL, Defendant ECN and Defendant John Does 1-20." [R. 19 at

13.]

Secondly, PTL broadly argues that "[n]othing in the Complaint suggests Plaintiffs are the

type of people the statute was designed to protect." [R. 78 at 8.] Granted, the typical facts in a

case filed under the federal forced labor statute involves the exploitation of non-english speaking

immigrants. *See Muchira v. Al-Rawaf,* 850 F.3d 605, 618–19 (4th Cir.), *as amended* (Mar. 3,

2017), *cert. denied,* 138 S. Ct. 448, 199 L. Ed. 2d 329 (2017) ("Typically, therefore, 'forced

labor' situations involve circumstances such as squalid or otherwise intolerable living conditions,

extreme isolation (from family and the outside world), threats of inflicting harm upon the victim

or others (including threats of legal process such as arrest or deportation), and exploitation of the

victim's lack of education and familiarity with the English language, all of which are 'used to

prevent [vulnerable] victims from leaving and to keep them bound to their captors.') (quoting

*Callahan*, 801 F.3d at 619). However, the Sixth Circuit has stated: "The statute's express terms

20

do not limit its application to immigrant victims or sex workers. Rather, § 1589(a)'s proscription against the exploitation of the labor or services of 'a person' by prohibited means encompasses *any person,* no matter her nationality or place of birth." *Callahan*, 801 F.3d at 617. Thus, the Court finds PTL's argument that Plaintiffs are the "wrong type of people" unconvincing.

### 1.  "Serious Harm"

The term "serious harm" is defined in 18 U.S.C. § 1589(c)(2) as

> any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

18 U.S.C. § 1589(c)(2). PTL argues that Plaintiffs failed to plead that they suffered or were threatened with a sufficiently "serious harm" as required under the statute. [R. 55-1 at 13-16; R. 78 at 6-9.] First, PTL contends that "the majority of cases require more than bare financial harm to conclude that the harm is 'serious.'" [R. 55-1 at 14.] PTL fails to cite to a single case requiring that a plaintiff must allege more than a financial harm in order to successfully plead the "serious harm" element of the claim. Instead, PTL cites to cases where plaintiffs successfully pleaded "serious harm" due to circumstances that involved more than solely financial harm. [R. 55-1 at 14; R. 78 at 7-8.] As Plaintiffs point out in response, [R. 76 at 17-18], just because other plaintiffs successfully pleaded "serious harm" in circumstances that involved more than financial harm does not mean that Plaintiffs claims involving only financial harm should be dismissed. Had PTL cited cases in which plaintiffs suffered a similar amount of financial harm yet the court found it not to be sufficiently serious, the outcome of the Court's analysis may have been different. However, as it is, PTL's argument fails.

21

Secondly, PTL argues that the amount of financial harm at stake in this case "does not meet the statutory threshold of 'serious.'" [R. 55-1 at 15.] Plaintiffs plead that the amount of money in question could be over $100,000.00.[12] [R. 19 at 13; R. 76 at 18.] This amount falls neatly in the spectrum of financial harm generated by the cases cited by PTL: below the $250,000.00 potential suit of *Antonatos v. Waraich*, No. 1:12-cv-01905-JMC, 2013 WL 4523792, at *2 (D.S.C. Aug. 27, 2013) but far above the $15,000.00 payments owed in *Nunag-Tanedo v. E. Baton Rouge Parish School Board*, 790 F. Supp. 2d 1134, 144 (C.D. Cal. 2011), and *United States v. Dann*, 652 F.3d 1160, 1171 (9th Cir. 2011). [*See* R. 78 at 8.] Therefore, the Court finds PTL's pleading of "serious harm" sufficient for this pleading stage of litigation.[13]

## 2.  Intent

PTL also contends that "Plaintiffs fail to adequately allege PTL knowingly threatened Plaintiffs, or knowingly benefited from their alleged forced labor." [R. 78 at 9.] Although the Court is unaware of any Sixth Circuit precedent on the matter, the Fourth and Ninth Circuit both emphasize that, under 18 U.S.C. § 1589, the defendant must intend to cause the victim to believe that he or she would suffer harm if he or she quit working for the defendant. *See Muchira v. Al-Rawaf*, 850 F.3d 605, 618 (4th Cir.), *as amended* (Mar. 3, 2017), *cert. denied,* 138 S. Ct. 448, 199 L. Ed. 2d 329 (2017) ("There must be evidence from which the jury could find 'that the employer intended to cause the victim to believe that she would suffer serious harm—from the

---

[12] As explained above, for the purposes of this motion, the Court shall take Plaintiffs' allegations as true that PTL collaborated with ECN in administrating the Lease-Purchase Program. Thus, at this pleading stage, the Court will consider both the amount owed under the Contractor Agreement and the Leasing Agreement.

[13] The Court acknowledges PTL's argument that the $5000.00 early termination fee should be considered as yet another liquidated damages clause, which are "common and routinely enforceable" under Kentucky law. [R. 55-1 at 15.] However, the Kentucky Supreme Court forbids such awards when they are "nothing more than a penalty or forfeiture." *Mattingly Bridge Co. v. Holloway & Son Const. Co.*, 694 S.W.2d 702, 706 (Ky. 1985). As neither party raises an argument regarding this issue, the Court will defer any further consideration until after discovery. *See, e.g., Panwar v. Access Therapies, Inc.*, No. 1:12-CV-00619-TWP, 2015 WL 1396599, at *4 (S.D. Ind. Mar. 25, 2015) (considering the distinction between permissible liquidated damages and a prohibited penalty upon motion for summary judgment).

22

vantage point of the victim—if she did not continue to work.'") (quoting *United States v. Dann*, 652 F.3d 1160, 1170 (9th Cir. 2011)).

Here, Plaintiffs pleaded that they were required to sign an ICS Agreement with PTL and a Lease Agreement with ECN, [R. 19 at 14, ¶ 71], and Plaintiffs were unable to terminate the ICS Agreement "because doing so would leave them in immediate default of the Lease Agreement, resulting in the same severe financial penalties as if Defendants had terminated the ICS Agreement." [*Id*. at 24, ¶ 118.] In short, Plaintiffs pleaded that the defendants designed the Lease-Purchase Program to "force the continued labor of Plaintiffs by using threats of serious financial harm through explicit threats to impose, enforce, and collect significant debts." [*Id*., ¶¶ 65, 119.] In opposition, PTL contends that Plaintiffs failed to allege that PTL knew of or had anything to do with the Lease Agreements or that PTL benefited from them. [R. 78 at 10.] However, the Court finds Plaintiffs allegations that the defendants collaborated in creating the Lease-Purchase Program sufficient to raise a plausible inference that PTL knowingly threatened Plaintiffs through the agreements and knowingly benefitted from their alleged forced labor. Furthermore, the few cases PTL cites in support of this argument all occur after both parties performed discovery, either on appeal from a motion for summary judgment or a jury conviction. *See Headley v. Church of Scientology International*, 687 F.3d 1173 (9th Cir. 2012) (on appeal from summary judgment); *United States v. Sabhani*, 599 F.3d 215 (2d Cir. 2010) (on appeal from jury conviction); *United States v. Calimlim*, 538 F.3d 706 (7th Circuit 2008) (on appeal from jury conviction). As previously mentioned, the analysis required of a 12(b)(6) motion to dismiss is quite different than that of a motion for summary judgment or an appeal of a jury conviction. At this pleading stage, *before discovery*, the Court finds that Plaintiffs have sufficiently plead their claim as required under Rule 8(a)(2).

In summary, PTL's Motion to Dismiss is it pertains to Count III of the First Amended Complaint is DENIED.

### C.  Unjust Enrichment

In PTL's final claim, it argues that Plaintiffs claim for unjust enrichment cannot stand because, under Kentucky law, unjust enrichment "is unavailable when the terms of an express contract control." [R. 55-1 at 17 (citing *Furlong Dev. Co., LLC v. Georgetown-Scott Cty. Planning & Zoning Comm'n*, 504 S.W.3d 34, 39-40 (Ky. 2016)).] Plaintiffs respond that this doctrine should not apply because "the Complaint clearly identifies that Plaintiff's unjust enrichment claims are based upon multiple aspects of Defendant's conduct beyond the confines of the contracts." [R. 76 at 30.] The Court finds that deciding this issue at the pleading stage would be premature, as this Court has previously stated:

> Generally, a plaintiff may not recover on both a claim for breach of contract and a claim for unjust enrichment. However, as pointed out by the Government, a party is permitted pursuant to Fed. R. Civ. P. 8(e)(2) to "state as many separate claims or defenses as the party has regardless of consistency and whether based on legal, equitable, or maritime grounds."

2004 WL 2403114, No. 5:00–cv–39–m, *26 (W.D. Ky. Sept. 30, 2004) (citing Fed. R. Civ. P. 8(a); *MDCM Holdings, Inc. v. Credit Suisse First Boston Corp.,* 216 F.Supp.2d 251, 261 (S.D.N.Y.2002) *abrogated on other grounds by Xpedior Creditor Trust v. Credit Suisse First Boston (USA) Inc.,* 341 F.Supp.2d 258,(S.D.N.Y.2004); *Tkachyov v. Levin,* 1999 WL 782070, *5 (N.D.Ill.Sept.27, 1999)(plaintiff may plead both breach of contract and unjust enrichment alternatively in a single complaint); *Quadion Corp. v. Mache,* 738 F. Supp. 270, 278 (N.D.Ill.1990)(same); *United States v. Kensington Hospital,* 760 F. Supp. 1120, 1135 (E.D.Pa.1991)(same)). The court in *Tillson* was ruling on a motion to dismiss for failure to state a claim and held that "at this stage of the litigation, the Court shall permit the Government to retain both the breach of contract claim and an unjust enrichment claim as alternative claims." *Id.; see also Burbick v. Premier Steel, L.L.C.,* 2008 WL 4756405, No. 08–13406, *3 (E.D. Mich. Oct. 23, 2008) (holding that on a motion to dismiss for failure to state a claim, it was proper for the plaintiff to allege a claim for unjust enrichment and breach of contract); *Matthews v. ALC Partner, Inc.,* 2008 WL 5188760, No. 2:08–cv– 10636,*12 (E.D. Mich. Dec. 9, 2008)(holding that it was improper to dismiss a claim for unjust enrichment even when claims for legal remedies had been pleaded when case was in pleading stage rather than remedial stage). While Rule 8 has been amended, the rule still states "[a] party may state as many separate claims or defenses as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(3). Additionally, the Rule

states the relief sought may "include relief in the alternative or different types of relief." Fed. R. Civ. P. 8(a)(3).

*Holley Performance Prod., Inc. v. Keystone Auto. Operations, Inc.*, No. 1:09-CV-00053-TBR, 2009 WL 3613735, at *5 (W.D. Ky. Oct. 29, 2009). Thus, the Court will defer this issue to a later date.

In summary, the Court finds that Plaintiffs pleaded enough factual matter to raise a plausible inference that PTL violated TILA regulations and the Forced Labor Statute and to plead a claim for unjust enrichment. Thus, PTL's Motion to Dismiss, [R. 55], is DENIED.

## CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED**:

(1) Element Transportation's Motion to Dismiss, [R. 32], is **DENIED.**

(2) PTL's Motion to Dismiss, [R. 55], is **DENIED**.

(3) The parties shall confer and submit a schedule **within 14 days** of this order. The schedule shall include a period of preliminary discovery, specifically on the issue of whether Element Transportation is a successor to ECN and whether ECN is a successor to EFC. **This matter is set for a telephonic scheduling conference for July 13, 2018 at 12:00 PM (NOON) Central Time. Counsel must call 1-877-848-7030 then give the Access Code 2523122  and #, then when prompted press # again to join the call.**

**IT IS SO ORDERED**.

cc: Counsel of Record

**Thomas B. Russell, Senior Judge**
**United States District Court**

June 19, 2018