UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT PADUCAH
CIVIL ACTION NO. 5:18-CV-041-TBR

GALE CARTER, *et al.*                                              PLAINTIFFS

v.

PASCHALL TRUCK LINES, INC., *et al.*                              DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant Element Transportation, LLC's ("Element Transportation") Motion for Summary Judgment. [R. 98.] Plaintiffs Gale Carter and Forbes Hayes (hereinafter "Plaintiffs") responded, [R. 110], and Element Transportation replied, [R. 113]. Also before the Court is Plaintiffs' Motion for Leave to File a Sur-Reply. [R. 119.] This matter is now ripe for adjudication. For the reasons stated herein, Element Transportation's Motion for Summary Judgment, [R. 98], is **GRANTED** and Plaintiffs' Motion for Leave to File a Sur-Reply, [R. 119], is **DENIED**.

## BACKGROUND

This case arises out of Gale Carter and Forbes Hayes's previous employment as truck drivers for Paschall Truck Lines, Inc. ("PTL"). In short, Element Financial Corp. ("EFC") leased tractor trailers to Plaintiffs who then subleased the tractor trailers and their driving services to PTL. [*See* R. 98-4 at 6-7 (Carter's Responses to Request for Admissions); R. 98-6 at 6 (Hayes's Responses to Request for Admissions).] Plaintiffs claim that this arrangement was represented to them as a "Lease-Purchase Program." [R. 103 at 16 (Amended Complaint).] Specifically, Plaintiffs claim that as a condition of their employment for PTL, PTL required Plaintiffs to lease tractors from EFC, and, under the lease agreement with EFC, Plaintiffs could only drive for PTL.

1

[*Id*. at 8.] If they did not drive for PTL, the Plaintiffs claim that they would default on their Lease Agreements, "subjecting Plaintiffs to an acceleration clause whereby Plaintiffs would be required to pay the entire balance of the lease immediately." [*Id*. at 9] However, this motion does not concern the substance of Carter and Hayes's claims. Rather, it involves the question of who should be held liable.

On October 20, 2015, Gale Carter entered in to an Individual Program Lease Agreement with EFC. [R. 98-3 at 2 (Carter Individual Program Lease Agreement).] That agreement terminated in December of 2015. [R. 98-4 at 7.] On March 18, 2016, Forbes Hayes entered into an Individual Program Lease Agreement with EFC. [R. 98-5 at 2 (Hays Individual Program Lease Agreement).] Hays discontinued his lease agreement in June of 2016. [R. 110-2 at 3 (Plaintiffs' Statement of Facts); R. 98-1 at 6.]

On June 30, 2016, EFC became Element Financial, LLC. [R. 110-11 at 3 (Certificate of Conversion).] Element Financial, LLC continued to operate the commercial and vendor leasing business it had previously operated as EFC. [R. 110-2 at 4; R. 98-1 at 6.] On September 19, 2016, a transaction occurred between Element Financial, LLC and Element Transportation, LLC, another subsidiary of Element Financial, LLC's parent company—Element Financial Corporation. [R. 110-19 at 67:17-21 (Bradley Rowse Deposition); R. 110-2 at 4; R. 98-1 at 7.] Plaintiffs refer to a different agreement than Element Transportation, but both parties claim the document to which they refer represents the transaction of September 19, 2016. Plaintiffs provided the Asset Purchase Agreement as evidence that Element Financial, LLC transferred the trucks and the rights to receive lease payments on those trucks to Element Transportation on that date. [R. 110-2 at 4 (citing R. 110-14).] Element Transportation provided the SUBI Sale Agreement, of the same date, as evidence that Element Financial, LLC sold Element

Transportation "a special unit of beneficial interest in certain vehicles held in trust, including the vehicles previously leased by the Plaintiffs." [R. 98-1 at 7 (citing R. 98-8).]

On October 3, 2016, Element Financial Corporation split to form ECN Capital Corp. and Element Fleet Management Corporation. [R. 110-19 at 49:12-18; R. 98-1 at 7.] As a part of the split, Element Financial, LLC became ECN Financial, LLC (ECN). [R. 110-19 at 49:12-18; R. 98-1 at 7; R. 110-2 at 5.] Plaintiffs states that, with that name change, ECN Financial, LLC was divested from Element Fleet Management Corporation and became a subsidiary of ECN Capital Corp. [R. 110-2 at 5.] Element Transportation, on the other hand, became a subsidiary of Element Fleet Management Corporation. [R. 110-19 at 40:16-41:7.]

On December 30, 2016, Element Transportation assigned its interests in the trucks and accompanying leases to ECN Financial, LLC as interim assignee and 19th Capital Group, LLC as assignee. [R. 98-9 at 1 (Assignment Agreement).] In exchange, Element Transportation received an approximately 49.9995 percent equity interest in 19th Capital Group and a loan receivable—with an initial balance of approximately $740 million. [R. 110-19 at 67:24-69:2.]

On December 19, 2017, Gale Carter and Forbes Hayes, on behalf of themselves and those similarly situated, filed the First Amended Complaint against PTL, ECN (as successor to EFC), and Element Transportation, LLC (as successor to ECN). [R. 19.] On October 12, 2018, Element Transportation filed the Motion for Summary Judgment that is currently before the Court. [R. 98.] It raises the question of whether Element Transportation should be considered a successor in liability to Element Financial, LLC.

## LEGAL STANDARD

Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals "that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court "may not make credibility determinations nor weigh the evidence when determining whether an issue of fact remains for trial." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001); *Ahlers v. Schebil*, 188 F.3d 365, 369 (6th Cir. 1999)). "The ultimate question is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Back v. Nestlé USA, Inc.*, 694 F.3d 571, 575 (6th Cir. 2012) (quoting *Anderson*, 477 U.S. at 251–52).

As the party moving for summary judgment, the defendant must shoulder the burden of showing the absence of a genuine dispute of material fact as to at least one essential element of the plaintiff's claims. Fed. R. Civ. P. 56(c); *see also Laster*, 746 F.3d at 726 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). Assuming the defendant satisfies his or her burden of production, the plaintiff "must—by deposition, answers to interrogatories, affidavits, and admissions on file—show specific facts that reveal a genuine issue for trial." *Laster*, 746 F.3d at 726 (citing *Celotex Corp.*, 477 U.S. at 324). As the United States Supreme Court has stated, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [nonmoving party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50 (citations omitted); *see Celotex,* 477 U.S. at 322–23. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on

which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252; see *Cox v. Ky. Dep't of Transp.,* 53 F.3d 146, 150 (6th Cir.1995).

## DISCUSSION

As mentioned above, this motion mainly concerns the question of whether successor liability should be applied to Element Transportation. The Seventh Circuit Court of Appeals once stated: "[T]he issue of successor liability is 'dreadfully tangled, reflecting the difficulty of striking the right balance between the competing interests at stake.'" *Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323, 1325 (7th Cir. 1990), *quoting EEOC v. Vucitech*, 842 F.2d 936, 944 (7th Cir. 1988). This proves to be true in the case at hand. The Court will address Element Transportation's Motion for Summary Judgment, [R. 98], as well as Plaintiffs' Motion for Leave to File a Sur-Reply, [R. 119.]

### I.     Element Transportation's Motion for Summary Judgment

Element Transportation moves for summary judgement on Count III and Count IV of the Amended Complaint. The Court will analyze each in turn.

### A.  Count III: Violations of the Federal Forced Labor Statute

Under Count III of the Amended Complaint, Plaintiffs allege that the defendants, including Element Transportation, "obtained the continuous labor of Plaintiffs by using threats of serious harm" and "operated a scheme, plan or pattern intended to cause Plaintiffs to believe that non-performance of labor would result in serious financial and professional harm." [R. 103 at 28-29.] Plaintiffs allege that this conduct violates the federal forced labor statute, 18 U.S.C. §§ 1589 and 1595. [*Id.*][1] In its Motion for Summary Judgment, Element Transportation asserts that it

---

[1] "The federal forced labor statute, 18 U.S.C. § 1589, was enacted as part of the Victims of Trafficking and Violence Prevention Act of 2000 (also known as the Trafficking Victims Protection Act)." *United States v. Callahan*, 801 F.3d 606, 617 (6th Cir. 2015).

should be granted summary judgment on Count III "because it did not agree to assume liability for Plaintiffs' claims and it would not be equitable and in keeping with federal policy to hold it liable as a successor when it did not have notice of Plaintiffs' claims, did not benefit from its predecessors' alleged unlawful conduct, and ECN is able to provide Plaintiffs the requested relief." [R. 98-1 at 5.]

"Successor liability is appropriate in the employment-law context if 'the imposition of such liability would be equitable.'" *Comer*, No. 2:14-CV-1986, 2016 WL 853027, at *5 (quoting *Cobb v. Contract Transp., Inc.*, 452 F.3d 543, 554 (6th Cir. 2006)).[2] In order to determine whether successor liability is equitable in a particular case, the Court must balance "1) the interests of the defendant-employer, 2) the interests of the plaintiff-employee, and 3) the goals of federal policy, in light of the particular facts of a case and the particular legal obligation at issue." *Cobb*, 452 F.3d at 554 (citing *EEOC v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086, 1091 (6th Cir. 1974)). "There is, and can be, no single definition of 'successor' which is applicable in every legal context." *MacMillan*, 503 F.2d at 1091. Furthermore, "[s]uccessor liability questions must be answered on a case by case basis, and 'a new employer . . . may be a successor for some purposes and not for others.'" *Cobb*, 452 F.3d at 554 (quoting *MacMillan*, 503 F.2d at 1091). The Sixth Circuit also held that the following nine factors are relevant when considering successorship liability:

> (1) whether the successor company has notice of the charge; (2) the ability of the predecessor to provide relief; (3) whether the new employer uses the same plant; (4) whether there has been substantial continuity of business operations; (5) whether the new employer uses the same or substantially same workforce; (6) whether the new employer uses the same or substantially same supervisory personnel; (7) whether the same jobs exist under substantially the same working

[2] Although district courts within the Sixth Circuit have previously applied successor liability under the FLSA and other federal statutes, the Court found no precedent, and the parties provided no case law, for the application of successor liability under the federal forced labor statute. However, as the parties do not dispute its application, the Court will engage in the successor liability analysis for the purposes of this motion.

conditions; (8) whether [the defendant] uses the same machinery, equipment and methods of production; and (9) whether [the defendant] produces the same product.

*Cobb*, 452 F.3d at 554. The Sixth Circuit further explained that these factors are "not in themselves the test for successor liability" but "simply factors courts have considered when applying the three prong balancing approach, considering the defendant's interests, the plaintiff's interests, and federal policy." *Id.* "The ultimate inquiry always remains whether the imposition of the particular legal obligation at issue would be equitable and in keeping with federal policy." *Id.*

### 1. Interests of the Defendant-Employer

In its Motion for Summary Judgment, Element Transportation argues that it had no notice of Plaintiffs' claims when it purchased a beneficial interest in certain vehicles held in trust through the SUBI Sale Agreement. [R. 98-1 at 7.] Therefore, Element Transportation asserts that it would be "grossly unfair to hold Element Transportation liable as a successor" and the interests of the defendant-employer weigh against successor liability. [*Id.*] In support of this element, Element Transportation submitted the deposition of Bradley Rowse, Senior Vice President of Finance at Element Fleet Management Corporation, in which Rowse stated that Element Transportation did not have any notice of the claims or alleged violations of the law asserted by Plaintiffs. [R. 98-1 at 11 (citing R. 110-19 at 104:4-7).] Also, Element Transportation points to § 3.02(e) of the SUBI Sale Agreement, in which ECN agreed that it was unaware of any claims or threatened claims against it upon entering the SUBI Sale Agreement. [R. 98-8 at 17 (SUBI Sale Agreement).][3] Furthermore, Element Transportation emphasizes that it purchased the

---

[3]Section 3.02(e) of the SUBI Sale Agreement states:

> There are no actions, suits or proceedings pending, or to the knowledge of the Seller threatened, against or affecting the Seller or the Origination Trust, or the property of the Seller or the Origination Trust, in any court, or before any arbitrator of any kind, or before or by any governmental body, which may materially adversely affect the financial condition of the Seller or the Origination Trust or otherwise have a Material Adverse Effect on the Seller or the Origination

SUBI assets at book value, "as opposed to a discount to account for known claims." [R. 98-1 at 11 (citing 98-8 at 7).] Element Transportation then cites three different cases from outside the Sixth Circuit in concluding that "[b]ecause it had no notice of Plaintiffs' claims, it would be grossly unfair to hold Element Transportation liable as a successor." [*Id*. at 11.][4]

In their Response, Plaintiffs make several arguments concerning notice. First, Plaintiffs argue that lack of notice is not dispositive to a finding of successor liability. [R. 110 at 17.] As support, Plaintiffs cite to *Clark v. Shop24 Global, LLC*, 77 F. Supp. 3d 660, in which the plaintiff brought an action against his former employer under the Fair Labor Standards Act (FLSA) and Ohio state law, alleging that the defendants failed to pay him overtime. *Clark*, 77 F. Supp. 3d at 668. During the plaintiff's employment, his initial employer, Shop24 USA, sold its assets to Shop24 Global; however, his job responsibilities did not change and he continued to work. *Id*. at 667. The Southern District of Ohio denied the defendant employers' motion for summary judgment on the issue of successor liability even though the plaintiff conceded that Shop24 Global did not have notice of the plaintiff's law suit against Shop24 USA when Shop24 Global bought its assets. *Id*. at 693. Although the court noted that the first factor was "[i]n one sense . . . irrelevant to the case at hand," the court also recognized that the record indicated that Shop24 Global "potentially had notice" of the claims against Shop24 USA because the plaintiff expressed concerns about overtime pay before the transfer from Shop24 USA to Shop24 Global

---

Trust. In addition, neither the Seller nor the Origination Trust is in default with respect to any order of any court, arbitrator or governmental body except for defaults with respect to orders of governmental agencies which defaults are not material to the business, property or operations of the Seller or the Origination Trust.

[R. 98-8 at 17.]
[4] Specifically, Element Transportation cites *Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323, 1327 (7th Cir. 1990); *Musikiwamba v. ESSI, Inc.*, 760 F.2d 740, 750 (7th Cir. 1985); and *Valdez v. Celerity Logistics, Inc.*, 999 F. Supp. 2d 936, 944, 946 (N.D. Tex. 2014).

occurred. *Id*. at 693 n.14. Similarly, Plaintiffs argue that Element Transportation "was or should have been aware of" Plaintiffs' potential claims. [R. 110 at 18.]

Secondly, Plaintiffs argue that Element Transportation had constructive notice of their claims against Element Financial, LLC. [R. 110 at 19.][5] As examples of courts that have broadly construed such notice, Plaintiffs cite to a Supreme Court case, *Golden State Bottling Co., Inc. v. N.L.R.B.*, in which the Court found that a successor business had notice due to an individual serving as a manager for both the predecessor and the successor business, and a Sixth Circuit case, *N.L.R.B. v. South Harlan Coal, Inc*., in which the court found the successor business had notice due, in part, to the proximity of the predecessor and successor's business operations. [*Id*. (citing *Golden State Bottling Co., Inc*, 414 U.S. 168, 173 (1973); *South Harlan Coal, Inc*., 844 F.2d 380, 386 (6th Cir. 1988)).] Plaintiffs reason that "[b]ased upon the principles of *Harlan* and *Golden State*, Courts have held that when a successor's officer was a director in a predecessor's company, such facts give rise to a determination of notice for a successor company of its predecessor's unfair labor practices." [R. 110 at 19 (citing *Laborer's Pension Fund v. Lay-Corn, Inc.*, 455 F. Supp. 2d 773 (N.D. Ill. 2006) and *Sullivan v. Alpine Irr. Co.*, No. 09 C 2329, 2011 WL 1575617, at *6 (N.D. Ill. April 25, 2011)]. Thus, Plaintiffs conclude that notice of Element Financial, LLC's unfair labor practices can be imputed upon Element Transportation because "[t]he officers of Element Financial, LLC . . . were the same as the officers of Defendant Element Transportation." [*Id*. at 20.] Furthermore, Plaintiffs argue "as evidenced by its use of

---

[5] For support, Plaintiffs cite *Musikiwamba*, 760 F.2d at 752 (explaining that "[n]ormally, the burden would be on the successor to find out from the predecessor all outstanding potential and actual liabilities") and *E.E.O.C. v. 786 S. LLC*, 693 F. Supp. 2d 792, 795 (W.D. Tenn. 2010) ("It is well-accepted that constructive notice may suffice under the successor liability doctrine, at least where the relevant charges have been filed with the EEOC"). Plaintiffs state that cases like *Musikiwamba* and *786 South, LLC* allow courts to "broadly construe[] the circumstances that constitute notice in the determination of successorship." [R. 110 at 19.]

identical lease terms, Defendant Element Transportation continued the unfair labor practices of its predecessors, presumably because of the benefits its predecessors derived from same." [*Id.*]

Finally, Plaintiffs reject Element Transportation's contractual argument regarding the SUBI Sale Agreement for two reasons. First, Plaintiffs state that "because the doctrine of successor liability is an equitable one, in making a determination on notice, entities may not rely upon contractual disclaimers to demonstrate an absence of notice." [*Id.* (citing *Clark*, 77 F. Supp. 3d at 692).] Second, Plaintiffs argue that the SUBI contract term that the seller is "unaware of any claims" does not control whether Element Transportation is liable for claims related to the assets it purchased because Element Transportation "expressly agreed to assume all liabilities of the seller, known or unknown, as set forth in Section 2.2 of the Asset Purchase Agreement . . .." [R. 110 at 21.]

In its Reply, Element Transportation mainly retorts these arguments made by Plaintiffs concerning notice. First, Element Transportation reiterates that it did not have notice of Plaintiffs' claims and argues that it would be inequitable to hold Element Transportation liable for the alleged unlawful acts of Element Financial, LLC when it did not have notice of those acts. [R. 113 at 2.] Specifically, Element Transportation quotes the following line from *Golden State* as support: "Since the successor *must have notice before liability can be imposed*, 'his potential liability for remedying the unfair labor practices is a matter which can be reflected in the price he pays for the business, or he may secure an indemnity clause in the sales contract which will indemnify him for liability arising from the seller's unfair labor practices.'" [*Id.* (quoting *Golden State Bottling Co., Inc.*, 414 U.S. at 185).] Secondly, Element Transportation distinguishes *Clark* from the matter at hand by stressing that, unlike the plaintiffs in *Clark,* the Plaintiffs in this matter never expressed concerns about potential violations of the federal forced

labor statute. [*Id*.] Third, Element Transportation asserts that the only evidence provided by Plaintiffs for the proposition that the officers at Element Financial, LLC were the same as the officers at Element Transportation is the Asset Purchase Agreement, in which Michael Beland signed on behalf of both the seller and the buyer. [*Id*. at 4.] However, Element Transportation states that this evidence falls short of being sufficient. Furthermore, Element Transportation argues that the "interplay between the terms of Plaintiffs' Lease Agreements with EFC and the terms of their ICS Agreements with PTL" is not adequate to prove that Element Transportation continued the alleged unlawful labor scheme because Plaintiffs did not show that "PTL continued to use the same terms in its ICS Agreement *and* that Element Transportation continued EFC's relationship with PTL." [*Id*.] Finally, Element Transportation argues that it did not assume Element Financial, LLC's liabilities in Section 2.2 of the Asset Purchase Agreement because "Section 2.2 applies only to future liabilities, *i.e.,* those that arise or accrue after the asset purchase is completed." [*Id*. at 5.]

Out of the tangled mass of notice arguments strewn before the Court, three main issues rise to the surface: (1) the weight of lack of notice in a successor liability analysis, (2) the evidence regarding crossover of officers from Element Financial, LLC to Element Transportation, and (3) contractual interpretation of the agreements between the parties. First, the Court recognizes that the parties take a different perspective on the weight of notice as opposed to the other nine *MacMillan* factors. Neither perspective is necessarily incorrect. While the Supreme Court seemingly made notice a requisite for successor liability in the quote provided by Element Transportation, the Sixth Circuit stated that the nine *MacMillan* factors "are not in themselves the test for successor liability" and "all nine factors will not be applicable to each case." *Cobb*, 452 F.3d at 554. Although other circuits have labelled notice as critical to the

successor liability analysis, *see, e.g., Wheeler v. Snyder Buick, Inc.*, 794 F.2d 1228, 1236 (7th Cir. 1986), the Sixth Circuit's stance on this matter remains unclear. However, notice's role in this case becomes more transparent when one examines the actual evidence before the Court.

Under the second issue, the Court notes that the only evidence provided for the assertion that the officers of Element Financial, LLC were the same as the officers of Element Transportation is the signature of one individual, Michael Beland, on behalf of both entities. [*See* R. 110 at 20.][6] Element Transportation emphasizes that Plaintiffs failed to provide any information on Beland, i.e., his title and responsibilities with the organizations, whether he was involved in the negotiations, the dates of his employment, whether he was involved in the alleged unlawful labor scheme, etc. Granted, the Sixth Circuit stated that "knowledge of unfair labor practice litigation need not be actual, but may be inferred from the circumstances." *S. Harlan Coal, Inc.*, 844 F.2d at 385 (6th Cir. 1988) (citing *Golden State Bottling Co.*, 414 U.S. at 173). However, Beland's signature on its own pales in comparison to the evidence available to the courts involving the officers in *Golden State* and *Harlan Coal*—the cases Plaintiffs cite as broadly construing the successor liability standard.[7]

---

[6] The signature referred to on the Asset Purchase Agreement is not labelled on the agreement itself. [R. 110-14 at 6.] However, Plaintiffs ask the Court to assume the signature belongs to the same person based on a visual comparison with the signature on a different document. [*See* R. 110-2 at 5, ¶ 24.] Plaintiffs provided no authentication of either of the signatures presented. The Court is ill-equipped to compare two signatures and determine whether they belong to the same person. However, even if they do belong to the same person, the evidence falls short of being sufficient.
[7] Plaintiffs also cite to two cases from the Northern District of Illinois in support of this contention. [*See* R. 110 at 19-20 (citing *Laborers' Pension Fund*, 455 F. Supp. 2d 773 and *Sullivan*, No. 09 C 2329, 2011 WL 1575617, at *6).] Beyond the fact that neither case is binding on this Court, both cases can be distinguished from the matter at hand. In *Laborers' Pension Fund*, it was undisputed that the individual at issue was an officer and director of both the predecessor and successor entities with "no question" that the successor had notice of the predecessor's obligations. *See Laborers' Pension Fund*, 455 F. Supp. 2d at 782. In fact, the defendants did not challenge the adequacy of notice. *Id.* n.15. Here, Element Transportation questions Beland's title and role as well as notice in general. In *Sullivan*, unlike the matter at hand, there was evidence that the individual at issue was "very involved in the day-to-day operations of Alpine" and he was president of the two alleged successor companies. *See Sullivan*, No. 09 C 2329, 2011 WL 1575617, at *6.

12

In *Golden State*, All American Beverages, Inc. bought Golden State Bottling Co.'s soft drink bottling and distribution business after the National Labor Relations Board (NLRB) ordered Golden State to reinstate with backpay a driver-salesman whose discharge was found to be an unfair labor practice. 414 U.S. at 170. The Supreme Court agreed with the NLRB that All American had notice of the unfair labor practice litigation because the secretary/manager of Golden State discharged the driver-salesman, closely followed the progress of the litigation, and then continued working with the entity under All American's ownership as a general manager and president. *Id*. at 173. In contrast, Plaintiffs provide no explanation or evidence as to Beland's position or whether he played any part in the alleged unlawful activity.

In *Harlan Coal*, Roy Jackson, the president of South Harlan Coal Company, Inc., personally negotiated and bought a coal mine, Mine No. 12, from Croley Coal. 844 F.2d at 381-82. In between two occasions of negotiations, miners employed at Mine No. 12 publicly picketed in protest of certain alleged unfair labor practices. *Id.* The Sixth Circuit affirmed the NLRB's finding of notice because Jackson was "*personally* engaged" in both negotiations, he lived in close proximity to the situs of unfair labor practices, he had a leading role in a major association dealing with the coal mining industry in the area, the local newspaper published three headline stories on the picketing (Jackson had a newspaper receptacle in front of his house), and the unfair labor practices occurred only a matter of months before the purchase of Mine No. 12. *Id*. at 386-87. Unlike *Harlan Coal*, the Plaintiffs in this matter provided no evidence regarding Beland's role in the negotiations, nor is there any further circumstantial evidence that would allow the Court to infer that he had knowledge of any unfair labor practices.

Under the third issue, the parties disagree over whether certain provisions from the SUBI Sale Agreement or the Asset Purchase Agreement serve as proof that Element Transportation did

or did not agree to assume the liability of the seller. As Plaintiffs emphasized in their Response, federal courts have generally held that a limitation of liability provision in an asset transfer agreement "does not control when the federal standard for successor liability is at issue." *Clark*, 77 F. Supp. 3d at 692 (citing *Teed v. Thomas & Betts Power Sols., L.L.C.*, 711 F.3d 763, 765 (7th Cir. 2013)); *Finnerty v. Wireless Retail, Inc.*, 624 F. Supp. 2d 642, 657 (E.D. Mich. 2009) (noting that exclusion of liability by contract does not necessarily prevent successor liability from attaching). Thus, the Court finds that, on this particular issue, the federal standard for successor liability controls over a contractual provision.[8]

Overall, the only evidence provided by Plaintiffs to show that Element Transport had notice of Element Financial, LLC's unfair labor practices is a signature from Michael Beland on the Asset Purchase Agreement and one lease agreement from after the asset purchase occurred, [*See* footnote 8]. In comparison to the binding case law on the matter, this amounts to the "mere existence of a scintilla of evidence in support of the plaintiff's position," which is insufficient to prove a genuine issue for trial. *Anderson*, 477 U.S. at 256. Therefore, the Court holds that the interests of the defendant-employer weigh against successor liability.

### 2. Interests of the Plaintiff-Employee

---

[8] The Court notes that Element Transportation also adds to the end of its notice argument: "Furthermore, as evidenced by its use of identical lease terms, Defendant Element Transportation continued the unfair labor practices of its predecessors, presumably because of the benefits its predecessors derived from same." [R. 110 at 20.] The issue with this statement is that Plaintiffs alleged in their Amended Complaint that it was the interplay between ECN's Lease Agreement and PTL's ICS Agreement that allowed the defendants to allegedly "force the continued labor of Plaintiffs" by threats of serious financial harm. [*See* R. 103 at 27.] The one piece of evidence provided by Plaintiffs on this matter is a lease agreement between Element Transportation and a lessee, Michael Grant, that was made after the asset purchase. [*See* R. 110-8 at 14.] However, the listed carrier in the agreement is not PTL, rather a company labelled "ASF." [*Id*. at 25.] Furthermore, Plaintiffs do not provide the agreement Grant entered with ASF in order to compare it to that of PTL. Thus, Plaintiffs have only provided half of the evidence required to show that Element Transportation continued the unlawful labor practice of trapping truck driving employees with an interlocking lease agreement and ICS agreement.

Element Transportation's second argument within its Motion for Summary Judgment is that Element Financial, LLC continued operating as ECN after the asset purchase and it has sufficient assets to pay the relief Plaintiffs seek on their federal forced labor statute claim. [R. 98-1 at 12.] Thus, Element Transportation concludes that the interests of the plaintiff weigh against successor liability. [*Id*.] Plaintiffs respond that the fact that Element Financial, LLC still exists and may be able to provide relief does not preclude a finding of liability against Element Transportation. [R. 110 at 22.] Furthermore, Plaintiffs assert that both Element Financial, LLC and Element Transportation may be held liable for the predecessor's bad acts under the doctrine of successor liability. [*Id*. at 23.]

Although Plaintiffs never acknowledge "the interests of the plaintiff-employee" and how it should weigh in the consideration of successor liability, [*see generally* R. 110], it seems that Plaintiffs have an interest in being able to provide their truck driving services free from "threats of serious harm" and to be compensated properly. However, as explained above, Plaintiffs have not provided sufficient evidence that Element Transportation knew of or was involved such threats. Furthermore, the parties do not dispute that ECN is solvent and may be able to compensate Plaintiffs. Thus, it would not necessarily be against Plaintiff's interests if Element Transportation was dismissed from this matter because Plaintiffs could still seek compensation from at least ECN. Considering that Plaintiffs brought this claim against Element Transportation, it would seem illogical to conclude that Plaintiffs' interests do not weigh in favor of successor liability. However, the lack of evidence and the availability of defendants to compensate Plaintiffs balances the scales. Thus, this prong weighs neutrally.

### 3. Plaintiffs' Other Arguments Regarding the *MacMillan* Factors

In Plaintiffs' Response, after discussing Element Transportation's first two arguments, Plaintiffs briefly argue the application of the remaining *MacMillan* factors. First, in reference to the third factor, Plaintiffs argue that Element Transportation utilized the same "plant" as Element Financial, LLC because the lease agreements of both companies identify the same address as the principle place of business. [R. 110 at 24.][9] Element Transportation responds that it did not have a physical address, rather the address listed on the agreement was simply a mailing address. [R. 113 at 7.] As neither party presents sufficient evidence to ultimately prove whether Element Transportation utilizes a physical location, the Court finds that this factor weighs neutrally. Furthermore, as Element Transportation is not a manufacturer, it is not clear that this factor is relevant to this matter in the first place. *See Finnerty*, 624 F. Supp. 2d at 658 (finding that the relevance of this factor was "not apparent" because neither defendant "operated a plant producing the goods that were the subject of the Agreement").

Secondly, under the fourth factor, Plaintiffs contend that Element Transportation continued the business operations of Element Financial, LLC because Element Transportation continued leasing trucks to individuals under the same lease terms and with the same "Element" logo on the agreement as Element Financial, LLC. [R. 110 at 25.] As evidence, Plaintiffs provide one lease agreement from after the asset purchase in which Element Transportation left every provision the same as Element Financial, LLC's lease agreements, except it changed the lessor name to Element Financial, LLC. [R. 110-8 at 14.] Element Transportation responds that there is no evidence that it provided equipment financing or vehicle fleet leasing to PTL. [R. 113 at 7.] Furthermore, under the fifth, sixth, and seventh factors, Element Transportation contends that it

---

[9] Plaintiffs also state that "both entities relied upon Quality Companies, LLC to provide the servicing of the Class A vehicles under the leases it held." [R. 110 at 24.] However, the Court finds this irrelevant to the matter of whether both entities utilized the same physical location.

16

did not have employees or supervisory staff and it did not maintain the same jobs under the same

working conditions as Plaintiffs experienced. [*Id.*] While Plaintiffs' broad argument under the

fourth factor seems to weigh in favor of successor liability, Element Transportation's pointed

observations under the fifth, sixth, and seventh factors seem to weigh against it. Ultimately, as

the parties mainly dispute the issue of notice, the limited discussion and evidence regarding these

factors have little to no effect on the determination of successor liability in this matter.

### 4. Keeping with Federal Policy

After arguing the first two prongs of the three-prong successor liability test, i.e., that the

interests of the employer and employee both weigh against applying successor liability, Element

Transportation concludes its Motion for Summary Judgment by arguing that holding it liable as a

successor would not "further the goals" of federal policy. [R. 98- 1 at 12.] Specifically, Element

Transportation quotes a conference report concerning the Trafficking Victims Protection Act

(TVPA) which states: "Section 1589 is intended to address the increasingly subtle methods of

traffickers who place their victims in modern-day slavery, such as where traffickers threaten

harm to third persons, restrain their victims without physical violence or injury, or threaten dire

consequences by means other than overt violence." H.R. CONF. REP. 106-939, at 101 (2000).

Element Transportation reasons that these goals are not furthered by holding it liable as a

successor because PTL and EFC are not traffickers, PTL and EFC did not use "subtle methods"

to trick Plaintiffs, and "it strains credulity" to compare Plaintiffs' contracts with PTL and EFC to

"modern day slavery." [R. 98-1 at 13.]

Also, Element Transportation argues that the general goals of the successor liability

doctrine under federal law are not furthered by holding Element Transportation liable. [*Id.*] It

contends:

The purpose underlying successor liability is to prevent a violator of law from being able to escape liability "by selling its assets. . . and then dissolving." The rationale for holding the successor liable is that "[t]he successor will have been compensated for bearing the liabilities by paying less for the assets its buying."

[*Id.* (quoting *Teed*, 711 F.3d at 766 (internal citation omitted)).] In contrast to this policy, Element Transportation argues that it received no lease payments from Carter or Hayes. Moreover, it did not receive any benefit from the alleged forced labor of any other owner-operators because it was guaranteed those lease payments by Element Financial, LLC "regardless of whether the owner-operators made any payments on their leases or provided any services to PTL." [*Id.* (citing R.110-19 at 71:21-72:14).]

In their Response, Plaintiffs first argue that although the federal forced labor statute is mostly commonly applied to situations involving undocumented immigrants being forced into labor or the sex trade, it should not be limited to such circumstances. [R. 110 at 26 (citing R. 80; *United States v. Callahan*, 801 F.3d 606, 617 (6th Cir. 2015)).] Plaintiffs assert that the conditions under which these truck drivers operate through the lease and labor agreements cannot be so easily brushed off as noncoercive or not involving forced labor. [*Id.*][10] Additionally, Plaintiffs argue that Element Transportation should be punished for benefitting from the unlawful practices by earning $28.4 million in leasing and over $30 million in loan interest because the federal forced labor statute states that "whoever knowingly benefits, financially or by receiving anything of value, from participation in a venture . . . shall be punished . . .." [*Id.* at 25-26.][11] Lastly, Plaintiffs also imply that not finding Element Transportation liable would

---

[10] Plaintiffs cite and briefly discuss an article from USA Today showing that "truckers in lease contracts suffer conditions reminiscent of indentured servitude." [*Id.*] Element Transportation object to the article on hearsay grounds. [R. 113 at 5.] The Court agrees that it is hearsay. *See Parker v. Winwood*, No. 16-CV-00684-JPM-AN, 2017 WL 6886076, at *9 (M.D. Tenn. Oct. 17, 2017) (collecting cases) ("Newspaper articles are typically considered hearsay under Rule 801(c) when offered for the truth of the matter asserted"). Furthermore, the article fails to establish notice because it was published almost a year *after* the asset sale on June 16, 2017 and it does not involve the parties in this case. [*See* R. 110 at 27 n.1 (citing USA Today article).]
[11] 18 U.S.C. § 1589(b).

violate the policy of successor liability in that it would allow Element Transportation to benefit from continuing the business operations of Element Financial, LLC without holding anyone accountable to the injured employees. [*Id.* at 28.][12]

Element Transportation counters Plaintiffs' arguments by stating that the "relevant question" at hand is whether it benefitted from Plaintiffs' forced labor—as opposed to whether it benefitted in general from the transaction. [R. 113 at 6.] Element Transportation agrees that it generated $28.4 million in revenue from lease payments for commercial trucks, however, "[n]one of this revenue was from Plaintiffs because Plaintiffs' leases had terminated and Plaintiffs had ceased performing work for PTL *before* Element Transportation purchased the SUBI assets." [*Id.*] Moreover, Element Transportation contends, once again, that it did not receive any increased lease payment revenue from any owner-operator because of the alleged unlawful labor scheme between EFC and PTL. [*Id.*] Rather, there was a "seller guarantee to pay EFC the payments due under the lease agreements regardless of whether the owner/operator drivers who signed those agreements made any payments or performed any work." [*Id.*] Lastly, Element Transportation rejects the notion that it receiving interest from 19th Capital is of any probative value because Element Transportation received no revenue from lease payments for commercial trucks after December 30, 2016. [*Id.* at 6-7.]

---

[12] Specifically, Plaintiffs state:

> It is again important to note that Plaintiffs assertion that Defendant Element Transportation be liable for violations of the Federal Forced Labor Statute is not based upon its mere purchase of EFC's assets. Rather, in the instant matter, Defendant Element Transportation was created from the reorganization of EFC's parent company, and thereafter continued the business that EFC previously engaged in. Based on its continuity of the business operation that underlies the violations of the Forced Labor Statute, and the benefits Defendant Element Transportation has received from same, it would be equitable to hold Defendant Element Transportation responsible for same.

[R. 110 at 28.]

In sum, the parties dispute whether finding Element Transportation liable as a successor to Element Financial, LLC will further the interest of federal policy, both under the federal forced labor statute and the general federal policy behind successor liability. The Court will consider their arguments concerning each policy in turn.

### a. The Federal Forced Labor Statute

"The federal forced labor statute, 18 U.S.C. § 1589, was enacted as part of the Victims of Trafficking and Violence Prevention Act of 2000 (also known as the Trafficking Victims Protection Act)." *Callahan*, 801 F.3d at 617. Although the legislative history quoted by Element Transportation depicts the statute as being directed specifically at human traffickers who place victims in "modern day slavery," the actual text of the statute yields a broader interpretation. The first portion of the statute reads:

> Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means--
> **(1)** by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
> **(2)** *by means of serious harm or threats of serious harm to that person or another person*;
> **(3)** by means of the abuse or threatened abuse of law or legal process; or
> **(4)** by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint,
>
> shall be punished as provided under subsection (d).

18 U.S.C. § 1589(a) (emphasis added). In Section (c) of the statute, the term "serious harm" is defined as:

> any harm, whether physical or nonphysical, including psychological, *financial*, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

18 U.S.C. § 1589(c) (emphasis added). As the Sixth Circuit stated in *Callahan* while interpreting

this statute, "[d]efendants are correct that '[w]hen construing a legislative enactment, [courts]

must give effect to the intent of the legislature adopting the statute in question.' But Defendants

forget that 'legislative intent should be divined first and foremost from the plain language of the

statute,' and 'reference to legislative history is inappropriate when the text of the statute is

unambiguous.' *Callahan*, 801 F.3d at 617-18 (internal citations omitted). Thus, Plaintiffs were

able to plead their claim under the plain language of the statute, but it remains ambiguous as to

whether finding Element Transportation liable as a successor would align with the goals of the

federal forced labor statute. As Element Transportation mentioned, the original purpose of the

overall Trafficking Victims Protection Act in 2000 was to "combat trafficking in persons, a

contemporary manifestation of slavery whose victims are predominantly women and children, to

ensure just and effective punishment of traffickers, and to protect their victims." 75 A.L.R. Fed.

2d 467 (quoting Pub. L. No. 106-386, § 102, 114 Stat. 1488 (2000)). Furthermore, there is no

case law currently available regarding the applicability of successor liability in a case involving

the forced labor statute. Thus, it remains uncertain whether a finding of successor liability in this

matter would align with the policy goals of the forced labor statute.

### b. Federal Successor Liability

As the Sixth Circuit stated in the context of applying successor liability in a Title VII

case:

> Failure to hold a successor employer liable for the discriminatory practices of its
> predecessor could emasculate the relief provisions of Title VII by leaving the
> discriminatee without a remedy or with an incomplete remedy. . . . It is to be
> emphasized that the equities of the matter favor successor liability because it is
> the successor who has benefited from the discriminatory employment practices of
> its predecessor.

*MacMillan*, 503 F.2d at 1091-92. Here, failing to hold Element Transportation liable as a successor would not "emasculate the relief provisions" of the federal forced labor statute because other defendants remain who may be able to compensate Plaintiffs. Furthermore, "the equities of the matter" do not favor successor liability because there is not sufficient evidence that Element Transportation knew of or benefitted from the alleged unlawful labor practices of Element Financial, LLC. Plaintiffs claim that this is a situation in which a parent company attempted to evade liability by transferring interests between subsidiaries. [*See* R. 110 at 26-27.] However, with no sufficient evidence that Element Transportation was aware of any unlawful labor practices and no dispute that ECN can provide monetary relief, the Court must disagree. This matter does not present a circumstance that aligns with the goals of successor liability under federal common law.

After weighing the interests of the employer and employee, as well as the goals of federal policy, the Court finds that the imposition of successor liability upon Element Transportation is inappropriate. Although the second prong seems to weigh neutral, the first and third both weigh against applying successor liability in this circumstance. Perhaps most importantly, it would not be equitable here to find Element Transportation liable when there is little to no evidence it had notice of Plaintiffs' claims and Plaintiffs may still seek relief from Element Transportation's predecessor, ECN. Thus, Element Transportation's Motion for Summary Judgment, [R. 98], as it applies to Count III of the Amended Complaint, is GRANTED.

### B.  Count IV: Violations of the Common Law Unjust Enrichment

Element Transportation also moves for summary judgment on Count IV of Plaintiffs' Amended Complaint, which alleges violations of common law unjust enrichment. In addition to federal common law, Element Transportation argues that it is also not liable as a successor under

Pennsylvania law, and, therefore, Plaintiffs' claim of unjust enrichment should be dismissed. [R. 98-1 at 14.] The parties do not dispute that Pennsylvania common law applies, as the lease agreements contained a Pennsylvania choice of law provision. [*See* R. 98-3 at 10; R. 98-5 at 10.]

Under Pennsylvania law, "it is well-established that 'when one company sells or transfers all of its assets to another company, the purchasing or receiving company is not responsible for the debts and liabilities of the selling company simply because it acquired the seller's property.'" *Cont'l Ins. Co. v. Schneider, Inc.*, 582 Pa. 591, 599 (2005) (quoting *Hill v. Trailmobile*, 603 A.2d 602, 605 (1992)). However, this rule is overcome if it is established that "(1) the purchaser expressly or implicitly agreed to assume liability, (2) the transaction amounted to a consolidation or merger, (3) the purchasing corporation was merely a continuation of the selling corporation, (4) the transaction was fraudulently entered into to escape liability, or (5) the transfer was without adequate consideration and no provisions were made for creditors of the selling corporation." *Hill,* 603 A.2d at 605.

As the factors under Pennsylvania law are rather similar to those under federal common law, the parties essentially repeat the arguments from the federal successor liability sections of their briefs. In relation to the five exceptions, Element Transportation argues: (1) the "SUBI Sale Agreement expressly states that Element Transportation did not assume an[y] of ECN's liabilities," (2) Element Transportation split with ECN rather than consolidate or merge, (3) ECN continued its commercial and vendor leasing business after the SUBI sale, (4) Element Transportation and ECN could not have entered into the transaction to escape liability because neither party had any knowledge of Plaintiffs' claims, and (5) Element Transportation paid "book value" for the SUBI assets. [R. 98-1 at 14-15.] Plaintiffs' respond that Element Transportation "explicitly agreed to assume the liabilities of its predecessor" pursuant to Section

2.2 of the Asset Purchase Agreement. [R. 110 at 30.] Furthermore, Plaintiffs contend that "during the period it continued the individual truck leasing business, Defendant Element Transportation represented a mere continuation of the individual fleet leasing business ECN Financial ran as EFC." [*Id.*]

First, as the Court explained above, Plaintiffs have not provided sufficient evidence that Element Transportation continued the unfair labor practices of its predecessor. Nor do Plaintiffs provide additional evidence here that Element Transportation was a "mere continuation" of ECN. In fact, neither party disputes that ECN continued doing business independently after the asset purchase occurred. [R. 113 at 7; R. 110 at 22; 24.] Thus, the Court finds this argument from Plaintiffs unconvincing.

Secondly, upon examining the plain meaning of the unambiguous language of the Asset Purchase Agreement, the Court disagrees with Plaintiffs' interpretation of Section 2.2.[13] Section 2.2 states that "Buyer," i.e., Element Transportation, "[f]rom and after the date hereof," shall assume "the following debts, liabilities and obligations of Seller":

> (a) All debts, liabilities and obligations of Seller in respect of or relating to the Transferred Assets *that arise, accrue or are to be performed as a result of, on or after the date hereof*, whether primary or secondary, direct or indirect, known or unknown, fixed or contingent, including, without limitation, any transfer taxes not required to be charged or collected by Seller; and

> (b) All debts, liabilities and obligations of Seller in respect of relating to the performance or completion of tasks, deliverables, services and other obligations required by the Transferred Contracts, *other than debts, liabilities and obligations of Seller arising from the breach of, or failure of Seller to comply, prior to the date hereof,* with any representation warranty, covenant or obligation in such Transferred Contracts.

---

[13] "When the words of an agreement are clear and unambiguous, the intent of the parties is to be ascertained from the language used in the agreement, which will be given its commonly accepted and plain meaning." *LJL Transp., Inc. v. Pilot Air Freight Corp.*, 599 Pa. 546, 559, 962 A.2d 639, 647 (2009) (internal citation omitted).

[R. 110-14 at 2 (emphasis added).] Both section 2.2(a) and section 2.2(b) state that Element Transportation is to be responsible for liabilities that occurred *after* the Asset Purchase Agreement, not "prior to the date hereof." [*Id.*] Thus, the Court finds Plaintiffs' contractual interpretation argument regarding successor liability under Pennsylvania law unconvincing as well. Element Transportation's Motion for Summary Judgment as it pertains to Count IV of Plaintiffs' Amended Complaint is GRANTED.

## II. Motion for Sur-Reply

Also before the Court is Plaintiffs' Motion for Leave to File a Sur-Reply. [R. 119.] In support of this motion, Plaintiffs argue that the "Reply of Defendant Element Transportation contains a substantial inaccuracy that must be addressed for the Court to have a complete understanding of the evidence in the record." [R. 119.] Specifically, Plaintiffs contend that Element Transportation incorrectly asserted that Plaintiffs failed to show that Element Transportation continued the unlawful forced-labor scheme between EFC and Paschall Truck Lines. [R. 119-1 at 2.] Plaintiffs go on to highlight evidence already in the record in an effort to refute this argument. [*See* R.119-1 at 2-3.]

"Although the Federal Rules of Civil Procedure do not expressly permit the filing of sur-replies, such filings may be allowed in the appropriate circumstances, especially '[w]hen new submissions and/or arguments are included in a reply brief, and a nonmovant's ability to respond to the new evidence has been vitiated.'" *Key v. Shelby Cnty.*, 551 F. App'x 262, 265 (6th Cir. 2014) (quoting *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 481 (6th Cir. 2003)). It is true that "sur-replies . . . are highly disfavored, as they usually are a strategic effort by the nonmoving party to have the last word on a matter." *Liberty Legal Foundation v. Nat'l Democratic Party of the USA, Inc.*, 875 F. Supp. 2d 791, 797 (W.D. Tenn. 2012) (internal quotation marks omitted). However,

the question of whether to permit such an additional filing is a matter left to the broad discretion of the trial court. *See Key*, 551 F. App'x at 264.

Here, Element Transportation did not make a new submission or argument in its Reply. Rather, it was responding to Plaintiffs' argument in its Response that "Defendant Element Transportation continued the unfair labor practices of its predecessors . . .." [R. 110 at 17.] Furthermore, the evidence Plaintiffs claim refutes Element Transportation's arguments in its Reply was already before the Court. Thus, Plaintiffs' Motion for Leave to File Sure-Reply, [R. 119], is DENIED.

## CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED**:

(1) Element Transportation's Motion for Summary Judgment, [R. 98], is **GRANTED**. As there are no remaining claims against this party, Element Transportation, LLC is **DISMISSED** from this case.

(2) Plaintiffs' Motion for Leave to File a Sur-Reply, [R. 119], is **DENIED**.

**IT IS SO ORDERED**.

*Thomas B. Russell*

**Thomas B. Russell, Senior Judge**
**United States District Court**

January 23, 2019

cc: Counsel of Record