## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## PADUCAH DIVISION

GALE CARTER, *ET AL.*                                                    PLAINTIFFS

v.                                                            No. 5:18-cv-41-BJB

PASCHALL TRUCK LINES, INC., *ET AL.*                                    DEFENDANTS

\* \* \* \* \* \*

### OPINION & ORDER

This is a case about truckers and their contracts with the motor carriers that hire them.  Truck drivers entered into contracts with Paschall Truck Lines, a national motor carrier, to haul loads in interstate commerce.  The agreements with PTL required the drivers to possess a truck to fulfill their obligations.  So some drivers leased trucks from Element Financial Corporation with the help of Quality Equipment Leasing.

The drivers claim that PTL's inclusion of a $5,000 "early termination fee" in its contracts constituted a "threat of serious harm" forcing them to labor for PTL against their will in violation of the Trafficking Victims Protection Act.  The drivers say that PTL directed them to Quality and EFC to sign lease agreements containing an acceleration clause that coerced them into remaining in their jobs longer than they wanted.  On top of that, the drivers claim that PTL's contracts violated a host of federal leasing regulations promulgated under the Motor Carrier Act of 1980.  And they assert that PTL and Element Fleet Management Corp. (EF*M*C, not to be confused with EFC) were unjustly enriched at the drivers' expense in violation of Kentucky law.

PTL and EFMC moved for partial and complete summary judgment, respectively, on named-plaintiff Gale Carter's claims.  Carter then moved to certify a putative class of similarly situated truckers.

The Court grants in part PTL's partial motion for summary judgment with respect to Carter's claims under the Trafficking Victims Protection Act and 49 C.F.R. §§ 376.12(a), (c), (e)–(f), (h)–(i).  But the Court denies that motion with respect to claims under §§ 376.12(d), (g) and denies Carter's motion for class certification.  During the telephonic hearing that preceded this opinion, the Court orally granted EFMC's motion with respect to Carter's unjust-enrichment claim, denied EFMC's motion with respect to Carter's TVPA claim, and granted Carter's Rule 56(d) motion to extend discovery.  Since that hearing, EFMC has filed a notice of settlement with the plaintiffs.  *See* DN 259.  So those issues are now moot to the extent the Court hasn't already resolved them.

# I.  Factual Record

Plaintiff Gale Carter drove trucks for Paschall Truck Lines, a motor carrier authorized by the Department of Transportation to haul freight.  PTL Response to Request for Admissions (DN 218-3) ¶ 28.  Carter and other drivers hired by PTL attended orientation in Murray, Kentucky and signed "Independent Contractor Service Agreements" with PTL.  Carter Dep. (DN 217-5) at 47, 81; Hays Decl. (DN 218-5) ¶¶ 9–11; Agreement (DN 177-2 Exhibit 3).  The Service Agreements required drivers to provide a truck (apparently often leased from Quality) that they would use to haul loads for PTL.  *See* Agreement at 90; Response to PTL MSJ (DN 217) at 7; Carter Dep. at 77; Hays Decl. ¶¶ 9–11.

The Service Agreements also required drivers to pay a $5,000 "early termination fee" if they quit within nine months of signing.  Agreement at 97.  Even though he reviewed the Agreement and was aware of the early-termination fee before signing it, Carter left PTL after working for only two months.  Carter Dep. at 183–84.

Carter, like others, leased a truck from EFC.  Carter Dep. at 107–08; Lease (DN 177-2) at 109; *see also* Hays Dep. (DN 177-3) at 128–32; Bates Dep. (DN 218-4) at 26.  The lease included an acceleration clause that would be triggered upon "default"—that is, when Carter "cease[d] using the Vehicle(s) for providing transportation services" for PTL.  Lease at 113.  The acceleration clause allowed EFC to repossess the truck, declare the balance of the lease payments immediately payable, or terminate the lease and require the lessee at his own costs to return the vehicle to a designated location.  *Id.*  Carter says that he was forced to continue laboring for PTL because he would have incurred "massive debt" if he had triggered the acceleration clause.  Response to PTL MSJ at 33.

At some point EFC undertook a significant corporate reorganization.  Although the papers are hardly clear, they appear to indicate that EFC split into two publicly traded companies.  EFMC, one of the two EFC progeny, allegedly inherited those leases, or at least the liability for them.  Second Am. Compl. (DN 103) ¶¶ 18–22; Element News Release (DN 110-9).

A substantial amount of litigation has already occurred in this case.  It has primarily focused on the plaintiffs' Fair Labor Standards Act claims.  The Court already conditionally certified an FLSA collective action, which seeks reimbursement from PTL for alleged unpaid wages.  *See Carter v. Paschall Truck Lines, Inc.*, No. 5:18-cv-41-TBR, 2019 WL 1576572, at *1 (W.D. Ky. Apr. 11, 2019).  Five defendants have been dismissed along the way, leaving just PTL and EFMC at the time these motions were filed.  With the FLSA claims in the rearview, the plaintiffs sought certification under Federal Rule of Civil Procedure 23(b)(3) to litigate on a classwide basis claims that (1) PTL's Service Agreements violated numerous provisions of the Truth in- Leasing regulations; (2) the contracts with PTL and EFMC forced drivers to labor on the companies' behalf, violating 18 U.S.C. § 1589; and (3) PTL and EFMC were unjustly enriched.  Second Am. Compl. ¶¶ 153–62.  PTL moved for partial

summary judgment on named-plaintiff Carter's Truth in Leasing Act and forced-labor claims. PTL MSJ (DN 177).[1]  And EFMC sought summary judgment on Carter's forced-labor and unjust-enrichment claims.  EFMC MSJ (DN 241).

The Court held a hearing to discuss these pending motions.  It orally denied the class-certification motion, granted in part PTL's summary-judgment motion, denied without prejudice EFMC's summary-judgment motion, and granted the plaintiffs' motion for discovery regarding EFC and EFMC.  The Court also indicated a written opinion further explaining its rulings would follow.  But before this opinion issued, EFMC and Carter (purportedly on behalf of "Plaintiffs") filed a notice of settlement.

As to the remaining claims, this opinion first addresses which claims against PTL survive summary judgment and which remain ripe for certification, a question addressed below.[2]

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  While the Court must view the evidence in the light most favorable to the non-movant, *Green v. Burton Rubber Processing, Inc.*, 30 F. App'x 466, 469 (6th Cir. 2002), the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## II. Truth in Leasing Act

In 1973, truckers declared a nationwide strike to "protest a host of economic problems" caused by "questionable industry practices."  *Global Van Lines, Inc. v. Interstate Commerce Commission*, 627 F.2d 546, 547–48 (D.C. Cir. 1980); *see also In re Arctic Express Inc.*, 636 F.3d 781, 795 (6th Cir. 2011) (quotation omitted).  After this "winter of discontent," Congress and the Interstate Commerce Commission

---

[1]  Forbes Hays is also a plaintiff in this lawsuit.  Carter's response to PTL's motion for summary judgment states that "Hays has directed undersigned counsel to seek Defendants' consent for his voluntary dismissal of his claims with prejudice…. [B]ecause he is withdrawing, Plaintiffs['] position is that Defendant's motion with respect to Hays is or will soon be moot."  Response to PTL MSJ (DN 217) at 6 n.1.  And during a telephonic hearing on these motions, all parties stipulated to Hays's dismissal.  So the Court dismisses Hays from the case under Federal Rule of Civil Procedure 21.

[2]  The parties jointly requested that the Court rule on Defendants' summary-judgment motions before ruling on the motion for class certification.  *See* Joint Status Report (DN 228) at 3.  So the Court proceeds in that order.  *See* NEWBERG AND RUBENSTEIN ON CLASS ACTIONS § 7:10 (6th ed.) ("If it is the defendant moving for summary judgment prior to certification, … [courts] … permit such motions to go forward …."); *J & R Marketing, SEP v. General Motors Corp.*, 549 F.3d 384, 390 (6th Cir. 2008) ("If it is found, prior to class certification, that the named plaintiffs' individual claims are without merit, then dismissal is proper.").

commenced hearings regarding the problems faced by independent truckers. *In re Arctic Express Inc.*, 636 F.3d at 795. The ICC then promulgated the Truth in Leasing regulations, now 49 C.F.R. Part 376, in order to "protect [the] owner-operators" who drove the trucks. *In re Arctic Express*, 636 F.3d at 795 (quotations omitted). These regulations were designed to "promote ... a full disclosure between the carrier and the owner-operator of the elements, obligations, and benefits of leasing contracts signed by both parties," and to "eliminate or reduce opportunities for skimming and other illegal or inequitable practices." *Id.* at 796 (quotation omitted). After Congress dissolved the ICC in 1995, Congress enacted 49 U.S.C. § 14704(a), which enables owner-operators to bring private lawsuits under the regulations against motor carriers registered with the Department of Transportation. *See Owner Operator Independent Drivers Ass'n, Inc. v. Swift Transp. Co.*, 367 F.3d 1108, 1110 (9th Cir. 2004) (discussing this regulatory history).

PTL is an authorized carrier subject to those federal leasing regulations, several of which Carter claims it violated. Second Am. Compl. ¶¶ 153–55. If proven, PTL would be "liable for damages sustained by a person as a result of" the carrier's violation. *See* § 14704(a)(2). As multiple courts have held, this requires a plaintiff to establish that a violation caused him "actual damages." *Owner-Operator Independent Drivers Ass'n., Inc. v. Landstar Systems, Inc.*, 622 F.3d 1307, 1325 (11th Cir. 2010) (collecting cases); *Rivas v. Rail Delivery Service, Inc.*, 423 F.3d 1079, 1083 (9th Cir. 2005) (no standing because violation of federal leasing regulations caused no concrete injury). And it's not hard to see why: the statute's text refers to "damages *sustained*." § 14704(a)(2) (emphasis added). So to survive PTL's motion for summary judgment, Carter must not only point to evidence that PTL violated the regulations, but also show how any leasing violation caused him actual harm. *See* PTL MSJ at 17; *Landstar System*, 622 F.3d at 1325 (owner-operators had to "show how they sustained damages because of the [carrier's] violations" of the leasing regulations).[3]

### A. § 376.12(a): Ownership

Carter alleges that PTL prematurely entered into an agreement with him before he lawfully possessed his commercial truck. Second Am. Compl. ¶ 126. The regulations require that a "lease shall be made between the authorized carrier and the owner of the equipment." 49 C.F.R. § 376.12(a). An "owner" is one who has title to the equipment, has the right to exclusive use of the equipment without title, or has

---

[3] PTL raises a non-trivial argument that the Truth in Leasing cause of action requires detrimental reliance in addition to actual damages. *See Owner-Operator Independent Drivers Ass'n v. Landstar System, Inc.*, 622 F.3d 1307, 1326 (11th Cir. 2010) (citing Truth in Lending Act decision for the proposition that "[t]o recover actual damages, consumers must show that they suffered a loss because they relied on an inaccurate or incomplete disclosure." (quotation omitted)). Several district courts have disagreed, however, and the plaintiffs never really join issue on this point. Given the Court's resolution of the summary-judgment motion on other grounds, addressing this disagreement is unnecessary at this stage—though if accepted this would provide an alternative basis for rejecting the plaintiffs' Truth in Leasing and class-certification arguments.

lawful possession of the equipment registered and licensed in the name of that person. § 376.2(d).

Carter entered into the Agreement with PTL on October 15, but didn't sign a vehicle lease. Carter Dep. at 81. He signed a vehicle lease with EFC on October 20. Carter Dep. at 108; Lease at 109, 119. Thus, Carter alleges he was not the "owner of the equipment" within the meaning of § 376.12(a) when he signed the contract with PTL. Second Am. Compl. ¶ 126. He contends this sequence caused him to "receiv[e] sub-minimum and sub-market wages." Response to PTL MSJ at 23.

But, as PTL points out, Carter offers no evidence that signing the contract five days before he signed the lease resulted in actual damages. PTL MSJ at 24.[4] Carter asserts, without citing anything from the record, that PTL's noncompliance with the regulation caused him to earn "sub-market wages"—that is, he didn't know what truck he could lease or how much it would cost. Response to PTL MSJ at 23 (suggesting his theory might benefit from additional discovery, which he nevertheless hasn't requested). Carter thus fails to "set forth specific facts" showing that there is a "genuine issue" for trial. *Scadden v. Werner*, 677 F. App'x 996, 1001 (6th Cir. 2017). Without any evidence of "actual damages," this claim cannot proceed. *See Derolf v. Risinger Brothers Transfer, Inc.*, 259 F. Supp. 3d 876, 886 (C.D. Ill. 2017) (dismissing § 376.12(a) claim because plaintiff failed to show actual damages).

### B. § 376.12(d): Specified Compensation

Section 376.12(d) states that the "method of compensation" or "[t]he amount to be paid by the authorized carrier for equipment and driver's services shall be clearly stated on the face of the lease or in an addendum which is attached to the lease." § 376.12(d). The lease or addendum, moreover, "shall be delivered to the lessor prior to the commencement of any trip." *Id.*

Carter claims that § 1.03 of the contract's appendix violates that regulation. Response to PTL MSJ at 19. Section 1.03 provides that "[t]he amount payable to Contractor related to accessorial services will be paid as follows: (a) All other charges for items such as multiple stop-offs; loading and unloading; lumper loading and unloading; detention/layover; reconsignment; redelivery; or authorized deadhead; etc. shall be paid to Contractor by PTL in the amounts which shall be communicated to

---

[4] Carter asserts that because the contract states that he is an independent contractor, rather than an employee, he made less income than expected, causing him actual damages. Response to PTL MSJ at 25–26. Therefore Carter contends he "can recover under TILA for the damages he suffered due to his misclassification and the misrepresentations … of the working relationship contained in the Service Agreement." *Id.* at 27. It is not immediately clear what prompted Carter to devote several pages in his brief to this argument. But to the extent he asserts that *any* alleged misrepresentations or misclassification by itself would *automatically* cause him actual damages, thereby saving all his Truth in Leasing claims, the Court rejects that contention. Carter cites no caselaw or regulatory language supporting that interpretation. And he doesn't tether his purportedly reduced fees to any actual leasing violation on the part of PTL. So Carter fails to establish actual damages on this theory.

Contractor upon request." Agreement at 100. PTL asserts that this language alone satisfies § 376.12(d). *See* PTL MSJ at 27. But this provision states only that the amount PTL will pay drivers will be "communicated" by PTL to a driver "upon request." And that is the only language PTL points to in support of summary judgment. This language alone doesn't "clearly state" the "amount to be paid" or "method of compensation" that PTL would use to pay drivers for accessorial services. § 376.12(d).

Carter also asserts that PTL's failure to clearly state his compensation for accessorial services caused him actual damages insofar as PTL secretly withheld accessorial fees owed to him under the contract. Response to PTL MSJ at 19–20. PTL expressly concedes that "summary judgment is not appropriate" on Carter's accessorial-fee theory, stating that the "issue should be left for another day." PTL Reply (DN 226) at 22–23. So the Court denies PTL's motion with respect to Carter's claim under § 376.12(d).

### C. § 376.12(g): Billing Documentation

When a driver's revenue turns on a percentage of the gross-shipment revenue, a lease "must specify" that the carrier "will give" the driver, "before or at the time of settlement, a copy of the rated freight bill." § 376.12(g). Carter claims that the Agreement violates this provision. Second Am. Compl. ¶ 128(a).

Section 3.04 of the Agreement states that Carter "shall have the right to examine copies of any documents which are necessary to determine the accuracy of the calculation of the compensation and/or validity of any deductions from Contractor's settlement." Agreement at 94. PTL says this language is sufficient. PTL MSJ at 23–24. But as the Seventh Circuit has explained, the contract "must specify *when* this information is to be made available, and then the carrier must provide it or be in breach of contract." *Brant v. Schneider Nat'l, Inc.*, 43 F.4th 656, 679 (7th Cir. 2022). So even though PTL afforded Carter the ability to examine income documentation, the lease appears to facially violate § 376.12(g) by not specifying that PTL will give Carter a copy of the freight-rated bill before or at the time of settlement. *Id.* Nor does PTL point to any evidence that, regardless of the contract's terms, it did in fact give drivers a copy of the bill at a specified time.

Carter presents evidence that in his view establishes actual damages: a settlement summary for a load he hauled showing that PTL was paid $500, from which he received 70% ($350). Response to PTL MSJ at 19–20; Carter Settlement (DN 217-10) at 1. But he notes that PTL's invoice for that order indicates it billed additional "accessorial fees" to the client for two "detentions" during the haul, one for $275 and the other for $50. *See* Invoice (DN 217-11) at 13. Carter says he never received his portion of these fees, which would be due under the lease assuming he followed the reimbursement procedures. Response to PTL MSJ at 19–20; Agreement at 100. PTL did not refute Carter's argument, stating only that the "issue should be left for another day." PTL Reply at 22–23. So the parties have a genuine issue whether, had PTL complied with the regulation by giving Carter a copy of the bill,

Carter would have taken some action to obtain additional fees allegedly owed to him. Summary judgment on this claim is therefore unwarranted at this time.

### D.  § 376.12(h): Charge-Back Items

A lease also must "clearly specify" all "[c]harge-back items," along with a "recitation as to how the amount of each item is to be computed." § 376.12(h). "Charge-back items" are amounts "that may be initially paid for by the authorized carrier, but ultimately deducted from the lessor's compensation at the time of payment or settlement." *Id.* Carter says that the Agreement failed to disclose charge-backs for prepaid legal services, the maintenance reserve account, drug-screening fees, advance fees, mud flaps, bus tickets, trailer-relocation costs, and service-failure fees. PTL MSJ at 28; *see also* Carter Interrog. (DN 177-8, Exhibit G-6) ¶ 13 (listing deductions).

A few of these arguments lack merit. Section 5.01 of the Agreement authorizes PTL to assess a $300 service-failure charge against the drivers. Agreement at 95–96. The Agreement also discloses how the cost of "the initial drug test" is computed, and that a $2,500 "trailer relocation fee" may be imposed. *Id.* at 100–01. Furthermore, an "advance fee" is not a "charge-back" under § 376.12(h). Carter alleges (without citing any evidence) that PTL deducted a $2 fee each time he requested a paycheck advance. Response to PTL MSJ at 24. While these advance fees were "ultimately deducted from the lessor's compensation," they were not "initially paid for by the authorized carrier." § 376.12(h). An employer does not *pay* an advance fee to another party, but rather *imposes* it on the employee who seeks payment early. So it's not a charge-back at all. And even if it were, because Carter presented no evidence that PTL actually charged him $2 advance fees, his claim cannot proceed.

The Service Agreement discloses the potential for maintenance-reserve account costs and prepaid legal-service costs, but does not provide a "recitation" of how those costs are calculated. Agreement at 104, 106. Carter, however, fails to show evidence of actual damages caused by any lack of transparency. Carter admitted that when he signed the contract, he knew PTL would deduct $250 from his paycheck to fund the maintenance-reserve account and $4.48 for the driver legal plan. Carter Dep. at 162–63. Carter doesn't explain what he would have done differently or how he would have negotiated a better deal had these amounts been printed in the Agreement, given that he already knew of their existence. Indeed, he says very little at all about this issue. So he fails to show actual damages.[5]

---

[5] In his response, Carter discussed his claim that PTL failed to adequately disclose maintenance-reserve accounts in the context of § 376.12(k), rather than § 376.12(h). Response to PTL MSJ at 21–22. But PTL didn't move for summary judgment on Carter's claims under § 376.12(k). So the Court instead addresses these claims in the section on class certification below.

Carter identifies two chargeback items—for mud flaps and bus tickets—that PTL did not disclose at all. The Agreement states that PTL may hold drivers responsible for "costs, and expenses associated with the operation of the Equipment, such as fuel, tires, tire chains (if necessary), load locks, empty mileage, permits of all types, tolls, fines, detention, and accessorial services." Agreement at 92. PTL admits that the Agreement does not mention mud flaps or bus tickets. PTL MSJ at 29. Instead, it characterizes mud flaps and bus tickets as "expenses associated with the operation of the Equipment." PTL Reply at 20. But § 376.12(h) requires the contract to "clearly specify" these "charge-back" items. Section 2.05(a)'s broad statement does not satisfy this requirement. *See Brinker v. Namcheck*, 577 F. Supp. 2d 1052, 1060–61 (W.D. Wis. 2008) (finding "general statements" insufficient under § 376.12(h)). Thus, the lease did not properly disclose the chargebacks for mud flaps and bus tickets.

Again, however, identifying a mere disclosure violation is not enough, because Carter must point to evidence that he suffered actual damages as a result of the omission. *Landstar Systems*, 622 F.3d at 1325–26. Carter merely asserts, without support, that "Defendant deducted hundreds of dollars from the Drivers' pay for bus tickets." Response to PTL MSJ at 23. His response brief refers to drivers plural, and does not say *Carter himself* was subject to unlawful bus-ticket deductions. *Id.* at 24 ("[T]he Lease Operators routinely had charges deducted from their pay that were not accounted for in their Leases."). Regardless of whether Carter is referring to himself alone or instead to the putative class of drivers, he cites no evidence that PTL actually failed to reimburse mud-flap or bus-ticket costs to Carter or the other drivers. *See id.* at 23–24. Carter "may not rest upon [his] mere allegations" on summary judgment. *Ellington v. City of East Cleveland*, 689 F.3d 549, 552 (6th Cir. 2012) (quotation omitted). Because he fails to "set forth specific facts showing that there is a genuine issue for trial" regarding actual damages, summary judgment for PTL is appropriate. *Id.*

The Court therefore grants summary judgment on all of Carter's claims under § 376.12(h).

### E. Abandoned Claims

PTL also moved for summary judgment on Carter's claims under several other Truth in Leasing regulations. First, PTL says the Agreement complies with § 376.12(c)(1), a disclosure regulation concerning equipment use, because the Agreement states that PTL retains "exclusive possession, control, and use of the Equipment while it is in service to PTL." PTL MSJ at 25–26. Second, PTL argues that it did not violate § 376.12(e) because § 2.05 of the Agreement tracks the regulation's exact language. PTL MSJ at 27. Third, PTL contends that it complied with § 376.12(f) because the Agreement did not set a time limit for drivers to submit delivery documents. PTL MSJ at 27–28. Fourth, PTL asserts that it did not force Carter to purchase equipment from PTL in violation of § 376.12(i). PTL MSJ at 25.

And, finally, PTL maintains that even if it did violate these provisions, Carter has no evidence that any violation resulted in actual damages.  PTL MSJ at 25–29.

Carter did not respond to any of these arguments.  The Sixth Circuit's "jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment." *Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013); *see also Hicks v. Concorde Career Coll.*, 449 F. App'x 484, 487 (6th Cir. 2011).  Because Carter abandoned these claims, the Court grants summary judgment for PTL.[6]

### III.  Trafficking Victims Protection Act

#### A. The Statute

Congress passed the TVPA under its Thirteenth Amendment authority in order to "combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect their victims."  Pub. L. No. 106-386, § 102, 114 Stat. 1464 (2000).  Initially a criminal statute, in 2003 Congress amended the TVPA to include a civil cause of action to remedy violations of the statute's forced-labor provision.  *See Ratha v. Phatthana Seafood Co.*, 35 F.4th 1159, 1164 (9th Cir. 2022); 18 U.S.C. §§ 1589(a), 1595(a).  Congress did so under the authority conferred by the Thirteenth Amendment to supply remedies the Amendment's text did not directly confer on victims.  *See Smith v. Kentucky*, 36 F.4th 671, 674–75 (6th Cir. 2022) (no implied private cause of action under the Thirteenth Amendment).

"[P]aradigmatic forced labor" cases involve sex trafficking and exploitation of immigrants.  *United States v. Toviave*, 761 F.3d 623, 626 (6th Cir. 2014); *see also United States v. Callahan*, 801 F.3d 606, 617 (2015).  Forced-labor victims typically face circumstances such as "squalid living conditions, extreme isolation, threat of legal process, and violence." *Callahan*, 801 F.3d at 620.  But although "the unique vulnerabilities of foreign-born victims" are usually at issue in a forced-labor case, § 1589 protects exploitation of "any person," regardless of his or her citizenship status. *Id.* at 617.

The Act prohibits "knowingly provid[ing] or obtain[ing] the labor or services of a person … by means of serious harm or threats of serious harm." § 1589(a). "Serious harm" is defined as "any harm, whether physical or nonphysical, including … financial … harm, that is sufficiently serious under all the surrounding circumstances to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." § 1589(c).  Liability requires a "causal link between one or more of the unlawful means enumerated in § 1589(a) and the labor actually obtained." *Martinez-Rodriguez v. Giles*, 31 F.4th 1139, 1155 (9th Cir. 2022).  And a

---

[6]  Carter's attorney confirmed at the telephonic hearing that Carter abandoned these claims.

plaintiff must show that the employer "intended the victim to believe that such harm would befall her if she left her employment." *Muchira v. Al-Rawaf*, 850 F.3d 605, 618 (4th Cir. 2017) (quotation omitted).

For "financial harm" to be sufficiently "serious," it "must be in some way improper or illicit." *Dale Carmen v. Health Carousel, LLC*, No. 1:20-cv-313, 2021 WL 2476882, at *6 (S.D. Ohio Jun. 17, 2021). This requires "distinguish[ing] between '[i]mproper threats or coercion and permissible warnings of adverse but legitimate consequences.'" *Headley v. Church of Scientology Int'l*, 687 F.3d 1173, 1180 (9th Cir. 2012) (church's threat to declare plaintiffs "suppressive persons" if they were to quit working, potentially causing them to lose contact with family and friends, wasn't improper and therefore didn't constitute a threat of serious harm) (quoting *United States v. Bradley*, 390 F.3d 145, 151 (1st Cir. 2004), *judgment vacated on other grounds*, 545 U.S. 1101 (2005))). So whether a liquidated-damages clause constitutes serious financial harm depends in part on whether the clause would be valid under the relevant state law. *See, e.g.*, *Paguirigan v. Prompt Nursing Emp. Agency LLC*, No. 17-cv-1302, 2019 WL 4647648, at *17 (E.D.N.Y. Sept. 23, 2019) (unlawful fee under New York law violated § 1589); *Panwar v. Access Therapies, Inc.*, No. 1:12-cv-619, 2015 WL 1396599, at *4 (S.D. Ind. Mar. 25, 2015) (lawful fee under Indiana law did not violate § 1589).

### B. Carter's Evidence

Carter's agreement with PTL obligated him to pay a $5,000 "early termination fee" if he "cease[d] providing services" for PTL within nine months of his start date. Agreement at 97.[7] The Service Agreement attributes this fee to PTL's "effort, expenses, costs in recruiting and contracting with Contractor, recruiting and contracting with additional Contractors to replace available units, and Carrier's loss of revenue." *Id.* Carter admitted that he knew about the $5,000 early-termination fee when he signed the contract, and that he nevertheless terminated the contract after working only two of the required nine months. *See* Carter Dep. 183–84, 88.

He argues, however, that including this fee in the Agreement amounted to forced labor. PTL, he contends, intentionally threatened him with financial harm serious enough to compel a reasonable person in his circumstance to continue working for PTL. Second Am. Compl. ¶¶ 134–43, 156–59; Response to PTL MSJ at 30.

---

[7] The Service Agreement also subjected Carter to a $2,500 fee in the event he failed to return his trailer to PTL within 48 hours of quitting. Agreement at 97. He only half-heartedly argues that this, in addition to the $5,000 fee, forced him to labor for PTL. *See* Response to PTL MSJ at 33. And for good reason: a reasonable person in Carter's position would not feel compelled to continue working due to a fee that wouldn't apply unless his employment ended when he couldn't return his trailer within two days. Agreement at 96–97 (termination may occur upon breach, death, inability to drive, equipment damage, abandonment, or misbehavior). Carter doesn't say why this speculative risk of an additional fee might compel his labor. So the Court (like Carter) focuses this analysis on whether the $5,000 early-termination fee constituted a threat of serious financial harm under § 1589(a).

The evidence cited in opposition largely consists of his own testimony. Carter thought PTL "would offer [him] the revenue to be able to pay for the truck, take care of my household, and build up some for maintenance." Carter Dep. at 83–84. PTL's recruiter indicated to Carter that he could make up to $1,500 per week. *Id.* at 90. But once he started, PTL offered him lower-paying loads than he expected or wanted. *Id.* at 90–91. Carter said that he went into debt because he made so little money working for PTL. *Id.* at 93. And with the threat of a $5,000 early-termination fee if he left, Carter felt "locked into PTL." *Id.* at 196. "I couldn't work for [any]body but PTL or it was all of these fines and stuff …." *Id.* at 203. He also cites "the coercive size of the fee" compared to what he was actually making, and the "collection letter" PTL allegedly sent a few months after Carter quit. Response to PTL MSJ at 38–39; Collection Letter (DN 217-15).[8]

Carter's decision to quit PTL and get a new job during his 9-month probationary period, rather than after the early-termination threat lapsed, is hard to square with his position that he felt compelled by the early-termination fee to keep working at PTL. Carter said that he left PTL because he "wasn't making money" and that he "never would have left the company" if he "had been making money." Carter Dep. at 277. To be sure, that "coercive pressures were not *indefinitely* successful" does not mean they were not "*initially* successful." *Martinez-Rodriguez*, 31 F.4th at 1156. But Carter's own testimony focuses his decisionmaking on his wages rather than the fee, which he said "didn't make [him] not leave." Carter Dep. at 95. That Carter quit after only two months, willingly triggering the $5,000 fee rather than waiting all 9 months, strongly suggests that the threat of the fee did not coerce him into working for PTL. *See id.* at 183–84. He agreed that he "decided to leave" PTL "as soon as" he decided that he wasn't "going to be able to generate more revenue." *Id.* at 96. To be sure, Carter also testified that he felt "locked in" and "couldn't afford

---

[8] Carter glancingly asserts that quitting PTL meant "he would lose the truck he had leased and forfeit all the lease payments he had already made, and expose himself to a massive debt from Quality and Element." Response to PTL MSJ at 33. Carter doesn't actually cite evidence concerning any "massive debt" PTL used to threaten him. Nor does he explain why lease payments made in the past (as opposed to liquidated damages paid in the future) would be unlawful under state law. Again, Carter "may not rest upon [his] mere allegations" at summary judgment. *Ellington v. City of East Cleveland,* 689 F.3d 549, 552 (6th Cir. 2012).

He also states, in a similarly conclusory fashion, that he couldn't leave PTL because he was "tied into the Quality Vehicle Lease," and that PTL's practices were "coupled with the coercive policies and practices of Quality and Element." Carter Response to PTL MSJ at 35, 37. But Carter cites no evidence in making this argument. *Id.* at 35. He does mention, in his statement of facts, an agreement between Quality and PTL, and asserts that PTL had input regarding Carter's lease terms. *Id.* at 9–10. But PTL's Chief Financial Officer provided unrebutted testimony that PTL had no involvement in preparing or implementing Carter's lease agreement. Wilson Dep. (DN 155-2) at 94–95. So Carter's hazy theory that PTL conspired with Quality and Element to force Carter to work does not withstand PTL's motion for summary judgment. *Ellington,* 689 F.3d at 552.

to leave and go to another company because [he] didn't have $5,000." *Id.* at 87, 196. His actions, however, show that he could afford to and actually did leave PTL for another job despite the fee.

Even assuming this evidence creates a genuine issue of material fact regarding his subjective feelings of coercion, it fails to satisfy the TVPA's objective-coercion requirement. Carter's evidence could not support a jury finding that a "reasonable person" in the "same circumstance" and of the "same background" as Carter would feel compelled to continue laboring in order to avoid triggering the $5,000 liquidated-damages clause. §§ 1589(a)(2) & (c)(2).

Carter alleges no physical, mental, or other pressures were brought to bear—only economic pressure. And unlike the plaintiffs in more extreme TVPA cases, Carter does not purport to be a non-citizen. Nor does anything suggest he struggles with the English language, is unusually uneducated, or is of a vulnerable age. *See Muchira*, 850 F.3d at 620–21. Carter admits he reviewed the terms of the contract, knew about the $5,000 fee when he signed that contract, and voluntarily entered into the agreement with PTL. Carter Dep. at 84, 88. He earned money from PTL—a projected $18,000 annual salary—just not as much as he had anticipated. Response to PTL MSJ at 38. Carter previously drove for several trucking companies and considers himself "an experienced truck driver." Carter Dep. at 20–29; Response to PTL MSJ at 36. This gave him a "viable 'exit option.'" *Muchira*, 850 F.3d at 620 (quoting *United States v. Calimlim*, 538 F.3d 706, 712 (7th Cir. 2008)). And he availed himself of that exit option by terminating the contract and leaving for "another trucking job that paid far better than PTL." Response to PTL MSJ at 38. He "felt" his old employer would rehire him. Carter Dep. at 278. And that's exactly what happened: Carter's previous employer hired him within "a matter of days" after he quit his job with PTL. *Id.* at 277.

Finally, Carter's assertion that the collection letter caused him to keep working for PTL is also unavailing. Response to PTL MSJ at 38–39. Carter didn't receive the letter until April 2016—*after* he had already left in December 2015. And he agreed that "PTL never threatened that [it] would sue" to enforce the liquidated damages clause. Carter Dep. at 276–77. So the letter and any concerns he had regarding contract enforcement have little if any bearing on the question whether he was objectively coerced (or, for that matter, on Carter's subjective perception of coercion).

## C. TVPA Caselaw

The precedent discussed by the parties and reviewed by this Court corroborate the appropriateness of summary judgment here. Other courts have recognized that facts showing that employment was voluntary—like Carter's early departure—undermine any argument that a plaintiff faced serious economic harm sufficient to trigger the TVPA. *See, e.g., Dinsay v. RN Staff Inc.*, No. 1:19-cv-907, 2022 WL 581033, at *6 (S.D. Ind. Feb. 25, 2022) (no threat of serious harm in part because plaintiff voluntarily entered into her employment agreement). Carter's circumstances were far from the prototypical forced-labor situation, "where extreme isolation, threats and

violence, and denial of access to education, [are] used to prevent the victims from leaving and to keep them bound to their captors." *Callahan*, 801 F.3d at 619.

Carter cites *United States v. Dann* for the proposition that a threatened $8,000 obligation upon departure is enough to constitute serious harm under § 1589. 652 F.3d 1160, 1171 (9th Cir. 2011); Carter Response to PTL MSJ at 26. That sum, like the $5,000 allegedly threatened here, is a substantial amount of money to be sure. But the financial consequence was not the only threat faced by the plaintiff in *Dann*. There, the defendant brought a non-English-speaker from Peru to the United States under a fraudulent visa to work as her housekeeper. 652 F.3d at 1162. Then the defendant kept the victim's passport, prevented her "from speaking with anyone outside the home," and "failed to pay her for two years." *Id*. The defendant at times threatened to force her to leave the country and also told her that if she left, she would owe the defendant $8,000. *Id*. at 1171–72. The Ninth Circuit unsurprisingly concluded that "[f]or an immigrant without access to a bank account and not a dollar to her name, a juror could conclude" that the threat was sufficiently serious. *Id*. Carter's situation is not remotely similar to that of the detained Peruvian housekeeper.

The other decisions Carter cites for the proposition that $5,000 is a sufficiently serious threat under § 1589(a) are likewise dissimilar. Many rested on allegations of the sort Carter hasn't backed up with evidence on summary judgment here. In *Nunag-Tanedo v. East Baton Rouge Parish School Board*, the defendants allegedly threatened to "fire Plaintiffs, sue them, allow their visas to expire, or deport them" over "complaints about living conditions and pay," in addition to requiring a $10,000 payment. 790 F. Supp. 2d 1134, 1146 (C.D. Cal. 2011); *see also Tanedo v. East Baton Rouge Parish School Board*, No. 10-cv-1172, 2012 WL 5378742, at *4 (C.D. Cal. Aug. 27, 2012) (serious harm where Filipino nationals from "poor famil[ies]" were threatened with "$12,000 in debt and worried they would be sent "back to the Philippines" and "replaced with someone else" if they did not "perform adequately"). In *Paguirigan v. Prompt Nursing Employment Agency LLC*, the plaintiffs alleged that the defendants sued them for $250,000 in tort damages in addition to a $25,000 contract termination fee. 286 F. Supp. 3d 430, 438 (E.D.N.Y 2017). And in *Javier v. Beck*, the defendants allegedly "threatened to withdraw [plaintiff's] visa application if he failed to report for work during a leave of absence" and "threatened to enforce a $15,000 confession judgment if [plaintiff] left their employ, failed to report for work, or challenged the legality of their conduct." No. 13-cv-2926, 2014 WL 3058456, at *6 (S.D.N.Y. July 3, 2014).

Carter also fails to show that the early-termination fee is "improper or illicit" under state law. Carter does not argue that the early-termination fee violated Kentucky state law. *See Dale Carmen*, 2021 WL 2476882, at *6–7. He instead cites a decision that applied *Tennessee* law for the proposition that "contract penalties are unlawful." Response to PTL MSJ at 39 (citing *Vanderbilt Univ. v. DiNardo*, 174 F.3d 751, 755 (6th Cir. 1999)). Under *Kentucky* law, however, a liquidated-damages provision is valid if: (1) "the actual damages sustained from a breach of contract would

be very difficult to ascertain" and (2) "after the breach occurs, it appears that the amount fixed as liquidated damages is not grossly disproportionate to the damages actually sustained." *Mattingly Bridge Co., Inc. v. Holloway & Son. Const. Co.*, 694 S.W.2d 702, 705 (Ky. 1985).  And Kentucky courts "tend to favor liquidated damage provisions." *Goetz v. Asset Acceptance, LLC*, 513 S.W.3d 342, 346 (Ky. Ct. App. 2016).

The evidence doesn't show that, as a matter of law, a $5,000 penalty would be grossly disproportionate to damages actually sustained, or that the amount wouldn't be particularly difficult to ascertain.  The Agreement states that this fee is necessary to cover PTL's recruiting costs and PTL's "loss of revenue" after an early departure. Agreement at 96.  Carter cites PTL's recruiting director's declaration stating that in 2017 PTL spent between $1,000 to $1,200 to "onboard a contractor" in suggesting that $5,000 is an unlawful penalty.  Bates Decl. (DN 177-5) ¶ 3.  But what PTL spent on recruiting in 2017 doesn't "clearly sho[w] that according to the circumstances existing at the time" Carter signed the Agreement in 2015, "the amount was *grossly* disproportionate" to any potential damages if Carter were to breach. *Patel v. Tuttle Properties, LLC*, 392 S.W.3d 384, 387 (Ky. 2013) (emphasis added) (quotation omitted).  This assumes, without explanation or evidence, that damages are limited to recruiting expenses.  Because Carter is the one "challenging the liquidated damages provisio[n], [he] bears the burden of proving" it is a penalty. *CDK Glob., LLC v. Scott & Reynolds, LLC*, No. 114-cv-45, 2016 WL 4435090, at *8 (W.D. Ky. Aug. 18, 2016).  By providing little to no evidence that, at the time he signed the contract in 2015, actual damages sustained from a breach were ascertainable or that $5,000 would be grossly disproportionate to that amount, Carter fails to carry that burden. *See C.E. Pennington Co. v. B & H Elec. Contractors, Inc.*, No. 2001-CA-1242, 2005 WL 3487865, at *13 (Ky. Ct. App. Dec. 22, 2005) ("Pennington, as the party challenging the damages, has the burden of proving that the damages exact a penalty.").

\* \* \*

Carter has not "present[ed] sufficient evidence upon which a jury could reasonably conclude" that PTL "knowingly or intentionally … made threats that were sufficiently serious to compel a reasonable person" in Carter's "position to remain" in PTL's "employ, against [his] will and in order to avoid such threats of harm, when [he] otherwise would have left." *Muchira*, 850 F.3d at 620.  So the Court grants summary judgment for PTL on Carter's forced-labor claim.

## IV.  Class Certification

Carter brought claims not only for himself, but also on behalf of other PTL drivers he alleged to be similarly situated.  He moved to certify three putative subclasses under Rule 23(b)(3).  Only two of those subclasses still require consideration in light of the summary-judgment ruling[9] above: the proposed Truth in

---

[9]  Carter also sought certification of a TVPA subclass.  Am. Class Cert. Mot. (DN 218-1) at 13.  But because the Court already granted summary judgment for PTL on Carter's TVPA claim, a TVPA class headlined by Carter cannot be certified. *See, e.g., McKinney v. Carlton Manor Nursing & Rehab. Ctr., Inc.*, 868 F.3d 461, 463 (6th Cir. 2017) (district court "granted

Leasing subclass and unjust-enrichment subclass.[10]  Am. Class Cert. Mot. (DN 218-1) at 12–13.

Carter defines the putative Truth in Leasing subclass as "all individuals who leased tractors from third-party leasing companies and then subleased these vehicles to PTL during the period four years prior to the filing of the initial Complaint in this manner through the present." Am. Class Cert. Mot. at 13.  The "Kentucky Common Law Unjust Enrichment class" is identical—except that it extends five rather than four years before the filing of the initial complaint.  *Id.*

Class certification is appropriate only if the putative class demonstrates "numerosity, commonality, typicality, and adequate representation." *Tarrify Properties, LLC v. Cuyahoga County*, 37 F.4th 1101, 1105 (6th Cir. 2022); *see* FED. R. CIV. P. 23(a).  Of these requirements, commonality is the most pertinent here. "Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury," rather than the mere "violation of the same provision of law." *Doster v. Kendall*, 48 F.4th 608, 612 (6th Cir. 2022) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349–50 (2011)).  The claims must "'depend on a common contention' whose resolution 'will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Id.* (quoting *Wal-Mart*, 564 U.S. at 350).  That is, "not every common question … will suffice …. What we are looking for is a common issue the resolution of which will advance the litigation." *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998).

To certify a class under Rule 23(b)(3), a plaintiff must also show that the class is "ascertainab[le]," that "questions of law or fact common to class members predominate over any questions affecting only individual members," and that the class action mechanism "is superior to other available methods for fairly and efficiently adjudicating the controversy." *Tarrify Properties*, 37 F.4th at 1105–06 (quotation omitted).

The "predominance criterion" is "demanding." *Zehentbauer Family Land, LP v. Chesapeake Expl., L.L.C.*, 935 F.3d 496, 503 (6th Cir. 2019) (quotation omitted). Although "[p]laintiffs need not prove that every element can be established by classwide proof," the "key is to identify the substantive issues that will control the outcome." *Sandusky Wellness Center, LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 468 (6th Cir. 2017) (quotation and alteration omitted).  "What matters to

---

summary judgment for [defendant] and thus had no need to rule on [plaintiff's] class certification motion"); *Miami University Wrestling Club v. Miami University*, 302 F.3d 608, 610, 616 (6th Cir. 2002) (affirming district court's denial of class certification as moot on ground that it granted defendants' motion for summary judgment on the same claims).

[10]  The class certification motion is directed toward certifying subclasses with common questions against PTL, not EFMC.  Not once does the motion mention either "Element" or "EFMC" by name.  EFMC nevertheless filed an opposition to Carters class certification. Element Response to Class Cert. Mot. (DN 238).  The Court construes Carter's motion, however, as seeking class certification against only PTL.

class certification ... is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Zehentbauer*, 935 F.3d at 503 (quoting *Wal-Mart*, 564 U.S. at 350).

The "party seeking class certification … bears the burden of 'affirmatively demonstrat[ing]' compliance with Rule 23." *Sandusky Wellness Center*, 863 F.3d at 466–67 (quoting *Wal-Mart*, 564 U.S. at 350). Clearing "a mere pleading standard," *Wal-Mart*, 564 U.S. at 350, is not enough; a court must be "satisfied, after a rigorous analysis," that the requirements of Rule 23 are met. *Zehentbaur*, 935 F.3d at 503–04 (quotation omitted).

### A. Truth in Leasing Subclass

Carter's class-certification motion relies on only three of the many federal leasing claims alleged in his amended complaint.[11] *See* Am. Class Cert. Mot. at 16; Carter Reply (DN 239) at 11–17. The Court already granted summary judgment against Carter on one of those three.[12] The two remaining claims concern allegations that PTL (1) improperly disclosed and used maintenance-reserve accounts in violation of § 376.12(k) and (2) failed to reimburse "accessorial fees" in violation of §§ 376.12(d) and (g).[13] Am. Class Cert. Mot. at 16–17; Carter Reply at 11–17. Because common questions do not predominate over individualized inquiries in resolving either claim, class certification is inappropriate.

### 1. Maintenance-Reserve Accounts

Each putative subclass member allegedly signed a contract with PTL establishing maintenance-reserve accounts. Am. Class Cert. Mot. at 8. These accounts were designed to assist drivers with "future maintenance costs" of their

---

[11] Carter therefore necessarily fails to meet his "burden of 'affirmatively demonstrat[ing]' compliance with Rule 23" with respect to all claims not raised in his class-certification motion. *Sandusky Wellness Center,* 863 F.3d at 466–67 (quoting *Wal-Mart Stores,* 564 U.S. at 350); *cf. Zehentbaur Family Land, LP v. Chesapeake Expl. L.L.C.*, 935 F.3d 496, 506 (6th Cir. 2019) (class certification appropriate because plaintiffs abandoned class-destroying claims at the certification stage). Carter's counsel conceded as much at the telephonic hearing.

[12] Carter sought to certify his claim that PTL did not adequately disclose "certain deductions," like those "related to service failures," from drivers' compensation in violation § 376.12(h). Am. Class Cert. Mot. at 16. In light of the Court's ruling above granting summary judgment for PTL on this claim, *see* Section II.D, class certification is not appropriate. *See McKinney*, 868 F.3d at 463; *Miami University Wrestling Club*, 302 F.3d at 610, 616.

[13] Carter's motion does not actually identify the specific provisions his accessorial-payment claims fall under. But at the hearing, Carter's counsel confirmed that Carter meant to specify §§ 376.12(d) and (g). That Carter's motion does not mention or tie his arguments to these specific provisions, however, weighs against a finding that Carter met his burden to comply with Rule 23.

leased trucks. *See* Agreement at 106. To fund the MRAs, PTL deducted money—effectively escrow funds—from drivers' weekly compensation. *Id.*

Carter asserts that PTL's use of undisclosed maintenance-reserve accounts violated § 376.12(k) with respect to the entire class. Am. Class Cert. Mot. at 16, 18. That regulation requires leases to disclose the parties' obligations concerning escrow funds—including the amount to be paid, how the carrier uses the funds, and the conditions for returning funds. *In re Arctic Exp. Inc*, 636 F.3d at 795; §§ 376.12(k)(1)–(2), (6). It also requires carriers to provide accountings of escrow funds and pay interest to the driver. *In re Arctic Exp.*, 636 F.3d at 794–95; §§ 376.12(k)(4)–(5).

Carter suggests that whether PTL's Service Agreements facially violate the disclosure regulation amounts to a common question under Rule 23. Am. Class Cert. Mot. at 16, 18. Not so. While the Service Agreements may have been uniform in some respects, they were not with regard to reserve-account disclosures. For example, Carter's Service Agreement did not explicitly disclose the amount PTL would deduct. Agreement at 106. Neither did Hays's nor Lakendal Harris's agreements. Am. Class Cert. Mot. at 8. But PTL cited evidence that other Service Agreements did in fact disclose the amount to be deducted into the reserve accounts.[14] *See* Darnell Decl. (DN 237-1) ¶ 7 (some class members' contracts included a termination fee). Nathaniel Thompson, a putative class member, signed a Service Agreement stating that PTL will deduct $250 each week. Nathaniel Thompson Maintenance Reserve Addendum (DN 237-1) at 29. Carter hasn't pointed to any evidence that large swaths of the class had contracts containing the same disclosure as his; he only cites Hays and Harris, while PTL counters with evidence that other putative class members received different disclosures. *See* Darnell Decl. ¶ 7. That's not enough commonality to create a meaningfully common question in this litigation. *See, e.g.*, *James v. Detroit Property Exchange*, No. 18-13601, 2021 WL 3629898, at *11 (E.D. Mich. Aug 17, 2021) (commonality not met because the "putative class members signed different agreements, with different material terms"). Because there's no way to resolve this issue for the entire class "in one stroke," it does not satisfy commonality. *Doster*, 48 F.4th at 612 (quotation omitted).

What about the question whether "the proper measure of damages," assuming a violation, "is the actual amount of the escrow deductions"? Am. Class Cert. Mot. at 18. Even assuming that question produces a common answer (and that much is not entirely clear given the apparent difference in contract language discussed above), it is not the type of "substantive issu[e] that will control the outcome" of the case. *Sandusky Wellness Center*, 863 F.3d at 468 (quotation omitted). How to calculate

---

[14] PTL also cited unrebutted evidence that 599 out of approximately 4,670 putative class members signed contracts that did *not* include a $5,000 early-termination fee. Darnell Decl. ¶ 12. And the fee amounts in the contracts that included them varied between a $3,000 and $5,000. ¶ 6. That the contracts varied in these ways inspires little confidence in Carter's (unsupported) assertion that the contracts were uniform with respect to the reserve-amount disclosures.

damages resulting from PTL's alleged conduct is subsidiary to the individualized question whether PTL did what the complaint alleges—improper use of each driver's maintenance-reserve account.

"Problems emerge on these predominance and superiority fronts, most acutely, when a controlling issue requires individualized determinations ill-equipped for classwide proof." *Tarrify Properties*, 37 F.4th at 1106. The controlling issue regarding the putative subclass's § 376.12(k) claims is likely to turn on how PTL handled each individual driver's individual deductions—an individualized factual inquiry that would overwhelm the single question of contract interpretation Carter highlights. Carter says that PTL violated § 376.12(k) by failing to "provide proper accountings" or "interest payments," and by using the accounts "to recover unlawful deductions and alleged debts owed by drivers to PTL." Am. Class Cert. Mot. at 16. But whether PTL did these things to the entire class cannot be determined in one stroke; rather, significant individual inquiry into each putative subclass member's records would be required to determine whether PTL failed to provide proper accountings or pay interest to each individual driver. And even if Carter is right that the method for calculating damages presents a common question, actually calculating those damages would not be.

Carter's motion identifies no evidence that PTL failed to pay interest to all or even many putative class members. Nor has he offered evidence that PTL uniformly failed to provide accountings for reserve-account balances. And he has not provided evidence that PTL unlawfully deducted funds from MRAs. *See* Am. Class Cert. Mot. at 16. To be sure, these are ultimately merits inquiries not ripe for resolution at the class-certification stage. *See Hicks v. State Farm Fire & Cas. Co.*, 965 F.3d 452, 463 (6th Cir. 2020). But they nevertheless must be resolved on an individual basis for all the putative subclass members. Based on the record before the Court at this stage, even if PTL "allegedly breached [its contracts] in the same general ways, [it] did so through a variety of specific means that are not subject to generalized proof for a large number" of drivers. *Klay v. Humana, Inc.*, 382 F.3d 1241, 1264 (11th Cir. 2004). Carter makes no attempt to demonstrate how common evidence could be used to resolve these central issues of liability for the entire putative subclass. So the claims apparently "require proof that is variable in nature and ripe for variation in application." *Tarrify Properties*, 37 F.4th at 1106–07. Because individual questions predominate over common ones, Rule 23(b)(3) is not satisfied and class certification is unwarranted for the maintenance-reserve claim.[15]

---

[15] Other courts have denied similar motions to certify a Truth in Leasing class. *See, e.g.*, *Owner-Operator Independent Drivers Ass'n, Inc. v. New Prime, Inc.*, 339 F.3d 1001, 1012 (8th Cir. 2003) (Carriers wouldn't be liable if "the Owner–Operator did not have a positive balance in his escrow account or the funds owed to the Owner–Operator were offset by other monies owed" to the defendants). "To make such determinations," these decisions have recognized, "a court would be required to examine each individual class member's account, including offsets, advances, and other items." *Id.* So class certification was inappropriate because "[r]ecovery for any plaintiff would be based on individual, not common, questions of fact." *Id.*;

## 2. Accessorial Payments

Carter also contends that PTL violated another regulation by withholding "accessorial payments" in a classwide manner. Am. Class Cert. Mot. at 16–17. In hauling freight for PTL's customers, he says drivers incurred "cost[s] and expenses associated with the operation" of their leased trucks, including "fuel, tires, … and accessorial services." *Id.* at 8 (citing Agreement at 92). PTL would reimburse drivers if they "(i) inform[ed] PTL of such charges; (ii) obtain[ed] from PTL written verification of an agreement with such charges; and (iii) … include[d] the charge on an invoice to PTL." Agreement at 93. Section 1.03(a) of the appendix to Carter's Agreement also states that PTL would reimburse a driver for accessorial charges if he "contact[ed] the dispatch agent the day that accessorial charges are incurred," the customer "authorize[d] the billing of the accessorial," and the driver "present[ed] properly signed documentation issued by the customer." *Id.* at 100. If the drivers did not follow these procedures, PTL would reimburse them when the customer paid PTL. Agreement at 100.

PTL does not dispute that the Service Agreements are uniform with respect to whether drivers would be paid accessorial fees. *See* PTL Response (DN 237) at 35–36. But even assuming this common language generated common questions for resolution, those wouldn't predominate over the individualized inquires required to establish PTL's liability to each putative class member, because liability requires a showing that each driver suffered actual damages. And those individualized determinations would dominate any common question. *See Landstar System*, 622 F.3d at 1326–27.[16]

Carter attempts to evade this conclusion by asserting that PTL "had a policy of not paying [drivers their] accessorial payments," which amounted to a "common questio[n] o[f] law and fact." Am. Class Cert. Mot. at 16–17; Carter Reply at 13–14. Why this would pose a common question is not obvious. Nothing in the leasing regulations implies a separate cause of action for pattern-and-practice claims as under Title VII. In any event, this inquiry might create more individualized questions than common ones. To establish a uniform "policy" of not reimbursing

---

see also *Owner Operator Independent Drivers Ass'n, Inc. v. FFE Transp. Servs., Inc.*, 245 F.R.D. 253, 256 (N.D. Tex. 2007) ("[T]he need for individualized inquiries goes beyond mere quantification of damages; rather, individualized inquiries are necessary to determine issues of standing and liability."). There, as "here, not every issue prior to damages is a common issue; instead, individualized issues permeate throughout the case." *Id.*

[16] Carter also asserts, without explanation, that a common question asks "whether PTL's failure to disclose its own receipt of accessorial fees for the loads in question violated the ICOA." Am. Class Cert. Mot. at 17. But this presupposes that PTL failed to disclose receipts for accessorial fees for each load with respect to each individual driver. But answering this question for each putative subclass member would require an individualized determination whether PTL actually failed to disclose these receipts. So no common answer, or even a common question, exists on this basis. *See Wal-Mart*, 564 U.S. at 350.

these expenses, Carter points to "several examples" of PTL's failure to reimburse Carter and Hays, Am. Class Cert. Mot. at 16, and "evidence of the same policy/practice" from a "random selection of opt-in plaintiffs." *Id.*; Regulation Violation Chart (DN 218-47). He doesn't indicate what proportion of fees or drivers PTL wrongfully failed to reimburse. *See* Martindale Decl. (DN 218-15).

Even if Carter's evidence showed classwide non-payment of accessorial fees, it would not show *why*. *See Wal-Mart*, 564 U.S. at 352. In several instances the parties disagree over whether PTL, the driver, or the client paid the relevant charge. *See* Response to PTL MSJ at 11–12; PTL Response at 37–38. This predicate question determines whether the driver was contractually entitled to the "unpaid" accessorial fee in the first place.

Because the accessorial payments to drivers are reimbursements, the drivers must first incur a qualifying expense. *See* Agreement at 93, 100. Next, they must document the expense and inform PTL according to agreed-upon procedures. *See id.* If they do not follow these procedures, they are entitled to reimbursement only if and when the customer pays PTL for the expenses. *See id.* at 100. The "manua[l] cross-checking" of these purported accessorial fees—against the putative class members' compliance with reimbursement procedures for each fee—is "sufficiently individualized to preclude class certification." *Sandusky Wellness Center*, 863 F.3d at 469.

To be clear, these determinations don't go to "individual variations in damages," which according to Carter "are not a valid reason to deny class certification." Am. Class. Cert. Mot. at 17 (citing *Sterling v. Velsicol Chemical Corp.*, 855 F.2d 1188, 1197 (6th Cr. 1988); *Zehentbauer*, 935 F.3d 496). So this isn't an instance in which "the *fact* of damages is a question common to the class even if the amount of damages sustained by each individual class member varies." *In re Sonic Corp.*, 2021 WL 6694843, at *3 (6th Cir. Aug. 24, 2021) (emphasis added) (quoting *In re Scrap Metal Antitrust Litigation*, 527 F.3d 517, 535 (6th Cir. 2007)). The "fact of damages" here is not a common question because Carter hasn't shown a common answer to the question whether PTL improperly failed to reimburse the putative subclass members for their accessorial services. At the class-certification stage, plaintiffs need to "show that they *can prove* … that all members of the class have suffered the same injury." *Id.* (quoting *Rikos v. Proctor & Gamble Co.*, 799 F.3d 497, 505 (6th Cir. 2015)). Carter offers no way to determine whether the drivers suffered the same *injury*—unpaid accessorial fees—on a classwide basis. *See Castillo v. Bank of America, NA*, 980 F.3d 723, 731–33 (9th Cir. 2020) (no class certification because whether putative class members were underpaid under purportedly unlawful overtime policy went to liability rather than damages, and putative class failed to "provide a common method of proving the fact of injury and any liability"). So the putative subclass fails to satisfy the predominance requirement.

## B. Unjust-Enrichment Subclass

At the last gasp—in a single paragraph on the last page of his motion to certify—Carter requests certification of a class based on unjust enrichment.[17] Before this point, Carter didn't make a serious effort to "'affirmatively demonstrat[e]' compliance with Rule 23." *Sandusky Wellness Center*, 863 F.3d at 466–67 (quoting *Wal-Mart*, 564 U.S. at 350). This means Carter waived the contention for all practical purposes. *See Peters Broad. Engineering, Inc. v. 24 Capital, LLC*, 40 F.4th 432, 442–43 (6th Cir. 2022) ([W]e have 'consistently held … that arguments made … for the first time in a reply brief are waived.") (quoting *Bormuth v. County of Jackson*, 870 F.3d 494, 500 (6th Cir. 2017)); *Boulet v. Nat'l Presto Indus. Inc.*, No. 11-CV-840-SLC, 2012 WL 12996298, at *12 (W.D. Wis. Dec. 21, 2012) ("By waiting to define his requested relief until his reply brief," plaintiff waived argument for class certification).

In any event, Carter's theory of liability, spread between the two filings, appears to be that PTL (1) misclassified the putative subclass members as contractors instead of employees, Am. Class. Cert. Mot. at 24–25, (2) failed to ensure that drivers received the minimum wage, *id.* at 25, (3) lured the drivers into working for them anyway with promises of "more money," "more freedom," and "more control," Carter Reply at 24, (4) "complete[d] freight deliveries on behalf of its customers" thanks to the drivers' unpaid labor, *id.*, and (5) reaped unjust profits from this labor, *id.*[18]

Even if not waived, Carter's theory fails. He raises a supposedly common question regarding whether PTL misclassified all the drivers as contractors, rendering the contract void. Am. Class. Cert. Mot. at 25; Carter Reply at 20–21 (citing *Williams v. Jani-King of Philadelphia, Inc.*, 837 F.3d 314, 325 (3d Cir. 2016) (employee classification resolvable through common documents and policies)).

But this misclassification question is wrapped in an equitable claim—and common questions will "rarely, if ever, predominate an unjust enrichment claim, the resolution of which turns on individualized facts." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1274 (11th Cir. 2009); *Russell v. Citigroup, Inc.*, No. 12-16, 2015 WL 9424144, at *9 (E.D. Ky. Dec. 22, 2015) (applying Kentucky law). To prevail on a Kentucky unjust-enrichment claim, a plaintiff must show a "(1) benefit conferred upon defendant at plaintiff's expense; (2) a resulting appreciation of benefit by defendant; and (3) inequitable retention of benefit without payment for its value." *Jones v. Sparks*, 297 S.W.3d 73, 78 (Ky. Ct. App. 2009). Courts must "examine the *particular circumstances of an individual case* and assure itself that, without a remedy, inequity would result or persist." *Vega*, 564 F.3d at 1274 (emphasis added);

---

[17] Carter's unjust-enrichment claim, Second Am. Compl. ¶¶ 160–62, rests on a different theory than the one in its class-certification motion. Am. Class. Cert. Mot. at 24–25. Regardless of whether his claims are properly pled, they are inappropriate for class action treatment.

*see also Jones*, 297 S.W.3d at 78.  This inquiry into equity often requires examining how particular plaintiffs expected defendants to reward them.  *See, e.g., Vega*, 564 F.3d at 1275.

Carter contends that PTL's "equitable culpability turns on the fairness and equity of the scheme" that lured the drivers with false promises of "more money," "more freedom," and "more control."  Carter Reply at 24.  So under Carter's own theory, each class member's claim requires a significant inquiry into his expectations and beliefs.  PTL's retention of a driver's labor might be "inequitable" if the drivers had signed with PTL because of its promises.  *See Jones*, 297 S.W.3d at 78.  But those who chose to sign with PTL for other reasons could not recover on this basis—or at least not without examining an independent set of facts and arguments.  Such individualized inquiries would predominate heavily over any purported common questions.  The Eleventh Circuit, for example, has considered the inquiry into employee knowledge of a compensation policy to predominate over common questions about that policy in the context of an unjust-enrichment claim.  *Vega*, 564 F.3d at 1275; *see also Babineau v. Federal Exp. Corp.*, 576 F.3d 1183, 1195 (11th Cir. 2009) (quantum meruit claims unsuitable for class certification because each claim involves an "inquiry into whether each employee *expected* compensation for non-work-related tasks") (emphasis added); *Masterson v. Federal Express Corp.*, 269 F.R.D. 439, 444 (M.D. Pa. 2010) (unjust enrichment was "essentially ... an individual inquiry" given the required showing of "a reasonable *expectation* of compensation") (emphasis added).  So the putative subclass does not satisfy the requirements for certification under Rule 23(b)(3).

## ORDER

As described earlier during the hearing on these motions, the Court grants in part PTL's motion for partial summary judgment (DN 177) on Carter's claims under the TVPA and 49 C.F.R. §§ 376.12(a), (c), (e)–(f), (h)–(i), and denies it in part with respect to §§ 376.12(d) & (g).  The Court denies Carter's motion for class certification (DN 218).  And the Court acknowledges that EFMC's motion for summary judgment (DN 241) on Carter's unjust-enrichment claim and Carter's motion for additional discovery (DN 245) on his TVPA claim are now moot in light of the parties' notice of settlement (DN 259).

Benjamin Beaton, District Judge
United States District Court

January 23, 2023